## SPANO *v.* NEW YORK.

No. 582.   Argued April 27, 1959.—Decided June 22, 1959.

*Herbert S. Siegal* argued the cause for petitioner. With him on the brief was *Rita D. Schechter.*

*Irving Anolik* argued the cause for respondent. With him on the brief were *Daniel V. Sullivan* and *Walter E. Dillon.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This is another in the long line of cases presenting the question whether a confession was properly admitted into evidence under the Fourteenth Amendment. As in all such cases, we are forced to resolve a conflict between two fundamental interests of society; its interest in prompt and efficient law enforcement, and its interest in preventing the rights of its individual members from being abridged by unconstitutional methods of law enforcement.

Because of the delicate nature of the constitutional determination which we must make, we cannot escape the responsibility of making our own examination of the record. *Norris* v. *Alabama*, 294 U. S. 587.

The State's evidence reveals the following: Petitioner Vincent Joseph Spano is a derivative citizen of this country, having been born in Messina, Italy. He was 25 years old at the time of the shooting in question and had graduated from junior high school. He had a record of regular employment. The shooting took place on January 22, 1957.

On that day, petitioner was drinking in a bar. The decedent, a former professional boxer weighing almost 200 pounds who had fought in Madison Square Garden, took some of petitioner's money from the bar. Petitioner followed him out of the bar to recover it. A fight ensued, with the decedent knocking petitioner down and then kicking him in the head three or four times. Shock from the force of these blows caused petitioner to vomit. After the bartender applied some ice to his head, petitioner left the bar, walked to his apartment; secured a gun, and walked eight or nine blocks to a candy store where the decedent was frequently to be found. He entered the store in which decedent, three friends of decedent, at least two of whom were ex-convicts, and a boy who was supervising the store were present. He fired five shots, two of which entered the decedent's body, causing his death. The boy was the only eyewitness; the three friends of decedent did not see the person who fired the shot. Petitioner then disappeared for the next week or so.

On February 1, 1957, the Bronx County Grand Jury returned an indictment for first-degree murder against petitioner. Accordingly, a bench warrant was issued for his arrest, commanding that he be forthwith brought before the court to answer the indictment, or, if the court had adjourned for the term, that he be delivered into the

custody of the Sheriff of Bronx County. See N. Y. Code. Crim. Proc. § 301.

On February 3, 1957, petitioner called one Gaspar Bruno, a close friend of 8 or 10 years' standing who had attended school with him. Bruno was a fledgling police officer, having at that time not yet finished attending police academy. According to Bruno's testimony, petitioner told him "that he took a terrific beating, that the deceased hurt him real bad and he dropped him a couple of times and he was dazed; he didn't know what he was doing and that he went and shot at him." Petitioner told Bruno that he intended to get a lawyer and give himself up. Bruno relayed this information to his superiors.

The following day, February 4, at 7:10 p. m., petitioner, accompanied by counsel, surrendered himself to the authorities in front of the Bronx County Building, where both the office of the Assistant District Attorney who ultimately prosecuted his case and the courtroom in which he was ultimately tried were located. His attorney had cautioned him to answer no questions, and left him in the custody of the officers. He was promptly taken to the office of the Assistant District Attorney and at 7:15 p. m. the questioning began, being conducted by Assistant District Attorney Goldsmith, Lt. Gannon, Detectives Farrell, Lehrer and Motta, and Sgt. Clarke. The record reveals that the questioning was both persistent and continuous. Petitioner, in accordance with his attorney's instructions, steadfastly refused to answer. Detective Motta testified: "He refused to talk to me." "He just looked up to the ceiling and refused to talk to me." Detective Farrell testified:

"Q. And you started to interrogate him?

"A. That is right.

"Q. What did he say?

"A. He said 'you would have to see my attorney. I tell you nothing but my name.'

"Q. Did you continue to examine him?
"A. Verbally, yes, sir."

He asked one officer, Detective Ciccone, if he could speak to his attorney, but that request was denied. Detective Ciccone testified that he could not find the attorney's name in the telephone book.[1] He was given two sandwiches, coffee and cake at 11 p. m.

At 12:15 a. m. on the morning of February 5, after five hours of questioning in which it became evident that petitioner was following his attorney's instructions, on the Assistant District Attorney's orders petitioner was transferred to the 46th Squad, Ryer Avenue Police Station. The Assistant District Attorney also went to the police station and to some extent continued to participate in the interrogation. Petitioner arrived at 12:30 and questioning was resumed at 12:40. The character of the questioning is revealed by the testimony of Detective Farrell:

"Q. Who did you leave him in the room with?
"A. With Detective Lehrer and Sergeant Clarke came in and Mr. Goldsmith came in or Inspector Halk came in. It was back and forth. People just came in, spoke a few words to the defendant or they listened a few minutes and they left."

But petitioner persisted in his refusal to answer, and again requested permission to see his attorney, this time from Detective Lehrer. His request was again denied.

It was then that those in charge of the investigation decided that petitioner's close friend, Bruno, could be of

---

[1] How this could be so when the attorney's name, Tobias Russo, was concededly in the telephone book does not appear. The trial judge sustained objections by the Assistant District Attorney to questions designed to delve into this mystery.

use. He had been called out on the case around 10 or 11 p. m., although he was not connected with the 46th Squad or Precinct in any way. Although, in fact, his job was in no way threatened, Bruno was told to tell petitioner that petitioner's telephone call had gotten him "in a lot of trouble," and that he should seek to extract sympathy from petitioner for Bruno's pregnant wife and three children. Bruno developed this theme with petitioner without success, and petitioner, also without success, again sought to see his attorney, a request which Bruno relayed unavailingly to his superiors. After this first session with petitioner, Bruno was again directed by Lt. Gannon to play on petitioner's sympathies, but again no confession was forthcoming. But the Lieutenant a third time ordered Bruno falsely to importune his friend to confess, but again petitioner clung to his attorney's advice. Inevitably, in the fourth such session directed by the Lieutenant, lasting a full hour, petitioner succumbed to his friend's prevarications and agreed to make a statement. Accordingly, at 3:25 a. m. the Assistant District Attorney, a stenographer, and several other law enforcement officials entered the room where petitioner was being questioned, and took his statement in question and answer form with the Assistant District Attorney asking the questions. The statement was completed at 4:05 a. m.

But this was not the end. At 4:30 a. m. three detectives took petitioner to Police Headquarters in Manhattan. On the way they attempted to find the bridge from which petitioner said he had thrown the murder weapon. They crossed the Triborough Bridge into Manhattan, arriving at Police Headquarters at 5 a. m., and left Manhattan for the Bronx at 5:40 a. m. via the Willis Avenue Bridge. When petitioner recognized neither bridge as the one from which he had thrown the weapon, they reentered Manhattan via the Third Avenue Bridge, which petitioner stated was the right one, and then returned to

the Bronx well after 6 a. m. During that trip the officers also elicited a statement from petitioner that the deceased was always "on [his] back," "always pushing" him and that he was "not sorry" he had shot the deceased. All three detectives testified to that statement at the trial. Court opened at 10 a. m. that morning, and petitioner was arraigned at 10:15.

At the trial, the confession was introduced in evidence over appropriate objections. The jury was instructed that it could rely on it only if it was found to be voluntary. The jury returned a guilty verdict and petitioner was sentenced to death. The New York Court of Appeals affirmed the conviction over three dissents, 4 N. Y. 2d 256, 173 N Y. S. 2d 793, 150 N. E. 2d 226, and we granted certiorari to resolve the serious problem presented under the Fourteenth Amendment. 358 U. S. 919.

Petitioner's first contention is that his absolute right to counsel in a capital case, *Powell* v. *Alabama,* 287 U. S. 45, became operative on the return of an indictment against him, for at that time he was in every sense a defendant in a criminal case, the grand jury having found sufficient cause to believe that he had committed the crime. He argues accordingly that following indictment no confession obtained in the absence of counsel can be used without violating the Fourteenth Amendment. He seeks to distinguish *Crooker* v. *California,* 357 U. S. 433, and *Cicenia* v. *Lagay,* 357 U. S. 504, on the ground that in those cases no indictment had been returned. We find it unnecessary to reach that contention, for we find use of the confession obtained here inconsistent with the Fourteenth Amendment under traditional principles.

The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered

from illegal methods used to convict those thought to be criminals as from the actual criminals themselves. Accordingly, the actions of police in obtaining confessions have come under scrutiny in a long series of cases.[2] Those cases suggest that in recent years law enforcement officials have become increasingly aware of the burden which they share, along with our courts, in protecting fundamental rights of our citizenry, including that portion of our citizenry suspected of crime. The facts of no case recently in this Court have quite approached the brutal beatings in *Brown* v. *Mississippi*, 297 U. S. 278 (1936), or the 36 consecutive hours of questioning present in *Ashcraft* v. *Tennessee*, 322 U. S. 143 (1944). But as law enforcement officers become more responsible, and the methods used to extract confessions more sophisticated, our duty to enforce federal constitutional protections does not cease. It only becomes more difficult because of the more delicate judgments to be made. Our judgment here is that, on all the facts, this conviction cannot stand.

Petitioner was a foreign-born young man of 25 with no past history of law violation or of subjection to official interrogation, at least insofar as the record shows. He

---

[2] *E. g., Cicenia* v. *Lagay*, 357 U. S. 504; *Crooker* v. *California*, 357 U. S. 433; *Ashdown* v. *Utah*, 357 U. S. 426; *Payne* v. *Arkansas*, 356 U. S. 560; *Thomas* v. *Arizona*, 356 U. S. 390; *Fikes* v. *Alabama*, 352 U. S. 191; *Leyra* v. *Denno*, 347 U. S. 556; *Stein* v. *New York*, 346 U. S. 156; *Brown* v. *Allen*, 344 U. S. 443; *Stroble* v. *California*, 343 U. S. 181; *Gallegos* v. *Nebraska*, 342 U. S. 55; *Johnson* v. *Pennsylvania*, 340 U. S. 881; *Harris* v. *South Carolina*, 338 U. S. 68; *Turner* v. *Pennsylvania*, 338 U. S. 62; *Watts* v. *Indiana*, 338 U. S. 49; *Lee* v. *Mississippi*, 332 U. S. 742; *Haley* v. *Ohio*, 332 U. S. 596; *Malinski* v. *New York*, 324 U. S. 401; *Lyons* v. *Oklahoma*, 322 U. S. 596; *Ashcraft* v. *Tennessee*, 322 U. S. 143; *Ward* v. *Texas*, 316 U. S. 547; *Lisenba* v. *California*, 314 U. S. 219; *Vernon* v. *Alabama*, 313 U. S. 547; *Lomax* v. *Texas*, 313 U. S. 544; *White* v. *Texas*, 310 U. S. 530; *Canty* v. *Alabama*, 309 U. S. 629; *Chambers* v. *Florida*, 309 U. S. 227; *Brown* v. *Mississippi*, 297 U. S. 278.

had progressed only one-half year into high school and the record indicates that he had a history of emotional instability.[3]  He did not make a narrative statement, but was subject to the leading questions of a skillful prosecutor in a question and answer confession.  He was subjected to questioning not by a few men, but by many. They included Assistant District Attorney Goldsmith, one Hyland of the District Attorney's Office, Deputy Inspector Halks,[4] Lieutenant Gannon, Detective Ciccone, Detective Motta, Detective Lehrer, Detective Marshal, Detective Farrell, Detective Leira,[5] Detective Murphy, Detective Murtha, Sergeant Clarke, Patrolman Bruno and Stenographer Baldwin.  All played some part, and the effect of such massive official interrogation must have been felt.  Petitioner was questioned for virtually eight straight hours before he confessed, with his only respite being a transfer to an arena presumably considered more appropriate by the police for the task at hand. Nor was the questioning conducted during normal business hours, but began in early evening, continued into the night, and did not bear fruition until the not-too-early morning.  The drama was not played out, with the final admissions obtained, until almost sunrise.  In such circumstances slowly mounting fatigue does, and is calculated to, play its part.  The questioners persisted in the face of his repeated refusals to answer on the advice of his

[3] Medical reports from New York City's Fordham Hospital introduced by defendant showed that he had suffered a cerebral concussion in 1955.  He was described by a private physician in 1951 as "an extremely nervous tense individual who is emotionally unstable and maladjusted," and was found unacceptable for military service in 1951, primarily because of "Psychiatric disorder."  He failed the Army's AFQT-1 intelligence test.  His mother had been in mental hospitals on three separate occasions.

[4] His name is sometimes spelled "Hawks."

[5] Although each is referred to separately in the record, it may be that Detectives Lehrer and Leira are the same person.

attorney, and they ignored his reasonable requests to contact the local attorney whom he had already retained and who had personally delivered him into the custody of these officers in obedience to the bench warrant.

The use of Bruno, characterized in this Court by counsel for the State as a "childhood friend" of petitioner's, is another factor which deserves mention in the totality of the situation. Bruno's was the one face visible to petitioner in which he could put some trust. There was a bond of friendship between them going back a decade into adolescence. It was with this material that the officers felt that they could overcome petitioner's will. They instructed Bruno falsely to state that petitioner's telephone call had gotten him into trouble, that his job was in jeopardy, and that loss of his job would be disastrous to his three children, his wife and his unborn child. And Bruno played this part of a worried father, harried by his superiors, in not one, but four different acts, the final one lasting an hour. Cf. *Leyra* v. *Denno*, 347 U. S. 556. Petitioner was apparently unaware of John Gay's famous couplet:

"An open foe may prove a curse,
But a pretended friend is worse,"

and he yielded to his false friend's entreaties.

We conclude that petitioner's will was overborne by official pressure, fatigue and sympathy falsely aroused, after considering all the facts in their post-indictment setting.[6] Here a grand jury had already found sufficient cause to require petitioner to face trial on a charge of first-degree murder, and the police had an eyewitness to the shooting. The police were not therefore merely trying to solve a crime, or even to absolve a suspect. Com-

---

[6] *Lisenba* v. *California*, 314 U. S. 219, is not to the contrary. There, while petitioner had already been arraigned on an incest charge, his later questioning and confession concerned a murder.

pare *Crooker* v. *California, supra,* and *Cicenia* v. *Lagay, supra.* They were rather concerned primarily with securing a statement from defendant on which they could convict him. The undeviating intent of the officers to extract a confession from petitioner is therefore patent. When such an intent is shown, this Court has held that the confession obtained must be examined with the most careful scrutiny, and has reversed a conviction on facts less compelling than these. *Malinski* v. *New York,* 324 U. S. 401. Accordingly, we hold that petitioner's conviction cannot stand under the Fourteenth Amendment.

The State suggests, however, that we are not free to reverse this conviction, since there is sufficient other evidence in the record from which the jury might have found guilt, relying on *Stein* v. *New York,* 346 U. S. 156. But *Payne* v. *Arkansas,* 356 U. S. 560, 568, authoritatively establishes that *Stein* did not hold that a conviction may be sustained on the basis of other evidence if a confession found to be involuntary by this Court was used, even though limiting instructions were given. *Stein* held only that when a confession is not found by this Court to be involuntary, this Court will not reverse on the ground that the jury might have found it involuntary and might have relied on it. The judgment must be

*Reversed.*

Mr. Justice Douglas, with whom Mr. Justice Black and Mr. Justice Brennan join, concurring.

While I join the opinion of the Court, I add what for me is an even more important ground of decision.

We have often divided on whether state authorities may question a suspect for hours on end when he has no lawyer present and when he has demanded that he have the benefit of legal advice. See *Crooker* v. *California,* 357 U. S. 433, and cases cited. But here we deal not with a suspect but with a man who has been formally charged

with a crime. The question is whether after the indictment and before the trial the Government can interrogate the accused *in secret* when he asked for his lawyer and when his request was denied. This is a capital case; and under the rule of *Powell* v. *Alabama,* 287 U. S. 45, the defendant was entitled to be represented by counsel. This representation by counsel is not restricted to the trial. As stated in *Powell* v. *Alabama, supra,* p. 57:

> "during perhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself."

Depriving a person, formally charged with a crime, of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself.

We do not have here mere suspects who are being secretly interrogated by the police as in *Crooker* v. *California, supra,* nor witnesses who are being questioned in secret administrative or judicial proceedings as in *In re Groban,* 352 U. S. 330, and *Anonymous Nos. 6 & 7* v. *Baker, ante,* p. 287. This is a case of an accused, who is scheduled to be tried by a judge and jury, being tried in a preliminary way by the police. This is a kangaroo court procedure whereby the police produce the vital evidence in the form of a confession which is useful or necessary to obtain a conviction. They in effect deny him effective representation by counsel. This seems to me to be a flagrant violation of the principle announced in *Powell* v. *Alabama, supra,* that the right of counsel extends to the preparation for trial, as well as to the trial itself. As Professor Chafee once said, "A person accused of crime

needs a lawyer right after his arrest probably more than at any other time." Chafee, Documents on Fundamental Human Rights, Pamphlet 2 (1951–1952), p. 541. When he is deprived of that right after indictment and before trial, he may indeed be denied effective representation by counsel at the only stage when legal aid and advice would help him. This *secret inquisition* by the police when defendant asked for and was denied counsel was as serious an invasion of his constitutional rights as the denial of a continuance in order to employ counsel was held to be in *Chandler* v. *Fretag*, 348 U. S. 3, 10. What we said in *Avery* v. *Alabama*, 308 U. S. 444, 446, has relevance here:

> ". . . the denial of opportunity for appointed counsel to confer, to consult with the accused and to prepare his defense, could convert the appointment of counsel into a sham and nothing more than a formal compliance with the Constitution's requirement that an accused be given the assistance of counsel."

I join with Judges Desmond, Fuld, and Van Voorhis of the New York Court of Appeals (4 N. Y. 2d 256, 266, 173 N. Y. S. 2d 793, 801, 150 N. E. 2d 226, 231–232), in asking, what use is a defendant's right to effective counsel at every stage of a criminal case if, while he is held awaiting trial, he can be questioned in the absence of counsel until he confesses? In that event the secret trial in the police precincts effectively supplants the public trial guaranteed by the Bill of Rights.

Mr. Justice Stewart, whom Mr. Justice Douglas and Mr. Justice Brennan join, concurring.

While I concur in the opinion of the Court, it is my view that the absence of counsel when this confession was elicited was alone enough to render it inadmissible under the Fourteenth Amendment.

Let it be emphasized at the outset that this is not a case where the police were questioning a suspect in the course of investigating an unsolved crime. See *Crooker* v. *California,* 357 U. S. 433; *Cicenia* v. *Lagay,* 357 U. S. 504. When the petitioner surrendered to the New York authorities he was under indictment for first degree murder.

Under our system of justice an indictment is supposed to be followed by an arraignment and a trial. At every stage in those proceedings the accused has an absolute right to a lawyer's help if the case is one in which a death sentence may be imposed. *Powell* v. *Alabama,* 287 U. S. 45. Indeed the right to the assistance of counsel whom the accused has himself retained is absolute, whatever the offense for which he is on trial. *Chandler* v. *Fretag,* 348 U. S. 3.

What followed the petitioner's surrender in this case was not arraignment in a court of law, but an all-night inquisition in a prosecutor's office, a police station, and an automobile. Throughout the night the petitioner repeatedly asked to be allowed to send for his lawyer, and his requests were repeatedly denied. He finally was induced to make a confession. That confession was used to secure a verdict sending him to the electric chair.

Our Constitution guarantees the assistance of counsel to a man on trial for his life in an orderly courtroom, presided over by a judge, open to the public, and protected by all the procedural safeguards of the law. Surely a Constitution which promises that much can vouchsafe no less to the same man under midnight inquisition in the squad room of a police station.