Ramon Antonio **FOURNIER** Sampedro, Defendant, Appellant,

v.

**PEOPLE OF PUERTO RICO**, Appellee.

No. 5550.

United States Court of Appeals First Circuit.

Sept. 8, 1960.

Gerardo Ortiz del Rivero, San Juan, P. R., for appellant.

Arturo Estrella, Deputy Solicitor Gen., San Juan, P. R., with whom Juan B. Fernandez Badillo, Solicitor Gen., San Juan, P. R., was on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

On November 26, 1950, an information was filed in the now superseded District Court of San Juan, Puerto Rico, charging the appellant herein with the first degree murder of his former wife by strangulation on September 7, 1950, and with thereafter clandestinely burying her body in the Fournier Cemetery in Isla Verde of which the appellant was a part owner and the general manager. A trial by jury on plea of not guilty at which evidence of two confessions, one in writing and the other oral, was introduced over Fournier's objections, resulted in a verdict of guilty on which the court sentenced to imprisonment for life.

On appeal the Supreme Court of Puerto Rico held that the written confession which came first, but not the subsequent oral one, "was psychologically coerced as a matter of law and was therefore obtained in violation of Federal due process of law." Further holding that the jury was not properly instructed as to the rules it should follow in deciding whether the oral confession was or was not given voluntarily, it remanded the case for a new trial. People v. Fournier, 77 P.R.R. 208 (1954). On a second trial by jury at which evidence of the oral confession was introduced, Fournier was again found guilty of murder in the first degree and was again sentenced to life imprisonment. On appeal the Supreme Court of Puerto Rico affirmed the judgment of sentence, 80 P.R.R. 380 (1958), and Fournier thereupon took the present appeal to this court under Title 28 U.S.C. §§ 1293 and 1294.

The facts are fully stated in the two opinions of the Supreme Court of Puerto Rico cited above. For present purposes a summary will do.

On September 7, 1950, Iris Nereida Hernandez Matos, who had married Fournier in 1947 and divorced him on the ground of cruelty in 1949, disappeared from her parents' home where she was living with her daughter born of her marriage with Fournier and also from her place of employment. Suspicion having attached to Fournier, he was picked up by the police at 8:00 A.M. on October 7, 1950, and "detained for investigation," to quote the phrase used by the Supreme Court of Puerto Rico to describe the custody under which he was held, until he confessed on October 10, 1950.

During the daytime Fournier was detained in the office of the District Attorney where he was provided with books and newspapers to read, a fan to keep himself cool and a comfortable chair in which to sit or nap. Although he was constantly attended by a detective, he was not disturbed but permitted to rest, read or nap and take food as he wished. Actually, he spent most of his time reading detective stories. At night Fournier

was taken to the police station where he was provided with a clean, comfortable bed and allowed to sleep undisturbed. During his incarceration he was never subjected to or threatened with any personal indignity or physical violence nor were any promises or inducements made to him to persuade him to confess. And, although he was held incommunicado, he never asked to see any friend, relative or attorney, nor did any friend, relative or attorney ask to see him.

About 24 hours after Fournier was taken into custody, that is on the morning of October 8, the body of Iris Nereida was discovered, buried in sand under the cement floor of a tomb in the Fournier Cemetery. It was lying fully dressed face down with the legs and arms bent over the back and a handkerchief tied over the nose and mouth. A woman's silver belt, her own, had been wound twice around the neck and knotted, and inside the knot was a 4½ inch nail. A pathologist testified that death by strangulation had occurred approximately four to six weeks earlier.

As soon as the body was found the District Attorney directed that Fournier be brought to the cemetery. There, beside the partially disinterred and badly decomposed body of his former wife he was asked in the presence of newspapermen, police officers and others if he could identify it, or if, as the manager and part owner of the cemetery, he could explain why, to all appearances, a body had been secretly buried there. At the first trial Fournier was described by witnesses as nervous, upset and trembling during this ordeal. At the second trial witnesses described him as not at all nervous but calm and collected. The testimony at both trials was that Fournier was noncommittal, refusing to say more than that the body was that of a woman.

After the visit to the cemetery Fournier was taken back to the office of the District Attorney where he was detained as before until about 10 o'clock at night on the following day, October 9, when for the first time the District Attorney began to question him. This examination lasted for about six hours, that is until about 4 o'clock the next morning. The questions and answers were taken down by a stenographer and as reported in part in the appellant's record appendix it is clearly evident that throughout this examination Fournier insisted upon his rights as he understood them and was vigilant if not belligerent in defending them. This interrogation failed to produce an immediate confession. However, after it was over, some time between 4 and 6 A.M., under circumstances not disclosed by the record, Fournier confessed in writing. When this was finished at daybreak, about six o'clock, the District Attorney told Fournier that now they must "go to the country," meaning by that to a partially completed house in San Anton where, according to Fournier's confession, the actual killing took place. Fournier replied, "When you wish," but when the District Attorney suggested that the trip be made the next day, Fournier suggested that the trip be made at once. At 11 o'clock on the morning of October 10 after a light breakfast Fournier left San Juan for San Anton accompanied by the District Attorney, detectives, police officers, and also several members of the press, including photographers, who were permitted if not actually invited to come along by the District Attorney. The party arrived at the partially completed house in San Anton about 11:30 and almost immediately Fournier began to act out his crime as he had confessed to it. As he did so he was frequently interrupted by the representatives of the press, who not only plied him with questions, most of them incriminating, but also took a great many pictures of him in a variety of poses some of which they suggested, while he re-enacted the killing, which he said he had done in the heat of passion. After obtaining this second confession the District Attorney took Fournier back to San Juan where he signed the earlier written confession and for the first time since he was taken into custody conferred with counsel and talked with a relative.

The question is not directly before us, but there is and can be no doubt that the Supreme Court of Puerto Rico was right in holding that Fournier's first written confession was psychologically coerced and hence involuntary, and therefore that its introduction in evidence violated Fournier's right to due process of law. The question presented to us on this appeal is whether the second oral confession was given under such circumstances that the introduction of evidence of it at the trial also constituted a violation of Fournier's right to due process of law in violation of either the Fifth or the Fourteenth Amendment.* We think this question must be answered in the affirmative.

We are not here concerned with a person without relatives or friends, or one who is immature in years, uneducated or naive. Nor are we concerned with a person who is stupid, feeble minded or insane. On the contrary, Fournier at the time he confessed was a successful young business man of wealth and family position who had enjoyed the advantages of a higher education both in Puerto Rico and in the continental United States and who was carrying on a prosperous undertaking and cemetery business in which he had been brought up by his father. But sophistication does not necessarily provide an accused with impenetrable armor; it does not establish that one has the mental vigor and emotional fortitude to stand up against coercive pressure. Indeed, the psychiatric testimony is that Fournier in some aspects at least is somewhat emotionally immature.

██ Anyway there can be little doubt of the success in breaking down Fournier's resistance of the not too subtle technique of prolonged and illegal detention with considerate treatment, interrupted only by a trip to a cemetery to view the badly decomposed body of his former wife and asserted victim, followed the next day by intensive interrogation from 10 o'clock at night to 4 o'clock the following morning. It is enough to say in support of this conclusion that the evidence is clear that up to and throughout his interrogation by the District Attorney Fournier was neither meek, submissive nor overawed but vigorously resisted any encroachment on what he believed to be his rights, and yet, sometime between 4 and 6 A.M. of the third day of his illegal detention, under circumstances not disclosed by the record, he suddenly became meek and submissive and confessed. We are not, as we have already pointed out, directly concerned with whether this written confession was coerced or not. The Supreme Court of Puerto Rico has answered that question, we think quite correctly, in Fournier's favor. Nevertheless, we have to look at the circumstances under which that confession was given to decide whether the coercion which produced it must necessarily have carried over to produce the subsequent oral confession at the partially completed house in San Anton. Leyra v. Denno, 1954, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948.

The Supreme Court of Puerto Rico relied upon several factors as the basis for its conclusion that the oral confession could be found by a jury to have been given voluntarily. It placed emphasis on the fact that the coercion which produced the written confession was only psychological, not accompanied by physical violence, threats or promises, apparently to suggest the inference that the effects of psychological coercion would wear off more quickly than the effects of physical violence. We are not aware of any scientific basis for that assumption. Indeed, for all we know the opposite may be the case. Moreover, the only evidence in the record bearing on the matter is that of a psychiatrist testifying for the defense who said: "I do not know what the mental condition of the defendant was when the first interrogation was finished, nor do I know his mental or psychological condition when he began

---

* It makes no difference which, for at least in this aspect it is frivolous to suppose that the phrase means one thing in the Fifth Amendment and something else in the Fourteenth. See opinion of Frankfurter, J., in Malinski v. People of State of New York, 1945, 324 U.S. 401, 415, 65 S.Ct. 781, 89 L.Ed. 1029.

his confession at San Anton. All I can say is that the psychological condition of the individual six hours later had to be the same or at least very similar to his previous condition."

The Supreme Court of Puerto Rico also rested its conclusion in part upon evidence, some oral and some in the form of photographs, that at San Anton Fournier did not appear to be tired or confused, but on the contrary appeared to be calm, collected, at ease, lucid, alert, friendly and cooperative. Appearances, however, can often be deceptive as pointed out in Blackburn v. State of Alabama, 1960, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed. 2d 242. And the testimony that at San Anton Fournier was friendly and cooperative has some tendency to support Fournier's theory of the case, for it has some tendency to show that his docile attitude, which after the interrogation in San Juan suddenly took the place of his previous wary and combative one, persisted throughout the San Anton confession, and from this the inference could be drawn that the coercion which produced the change of attitude in San Juan continued to operate in San Anton.

These factors and others relied upon by the Supreme Court of Puerto Rico for its conclusion that the voluntariness and hence the admissibility of the oral San Anton confession was for the jury to decide would make this a somewhat close case if the confessor's state of mind, which is all the Supreme Court of Puerto Rico considered, were the only matter to be taken into account. See Lyons v. State of Oklahoma, 1944, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481. But, subsequent to the date of the decision of the Supreme Court of Puerto Rico, the Supreme Court of the United States in Blackburn v. State of Alabama, supra, clearly expressed what may have been implicit in some cases subsequent to the Lyons case when at page 207 of 361 U.S., at page 280 of 80 S.Ct. it said:

"But neither the likelihood that the confession is untrue nor the preservation of the individual's freedom of will is the sole interest at stake.

As we said just last Term, 'The abhorrence of society to the use of involuntary confessions * * * also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.' Spano v. [People of State of] New York, supra [1959, 360 U.S. 315] at [pages] 320–321 [79 S.Ct. 1202, at pages 1205, 1206, 3 L.Ed.2d 1265]. Thus a complex of values underlies the stricture against use by the state of confessions which, by way of convenient shorthand, this Court terms involuntary, and the role played by each in any situation varies according to the particular circumstances of the case."

It is the complex of values in this case which definitely tips the scale. Our sense of justice and fair play is offended by the spectacle of an accused being permitted, if not actively encouraged, to act out his sadistic and brutal crime of violence, which in this case had sexual overtones, in public before newspaper reporters and photographers who were invited to attend and allowed actively to participate in the whole sordid business. The presence of representatives of the press on the occasion served no legitimate public purpose. We find the language of Mr. Justice Blair in Attorney General v. Tonks (1934) N.Z.L.R. 141, 148 at 150 quoted with approval by Mr. Justice Frankfurter in his concurring opinion in Pennekamp v. State of Florida, 1946, 328 U.S. 331, 363, 66 S.Ct. 1029, 1045, 90 L.Ed. 1295, footnote 10, particularly appropriate:

"It is idle for such newspapers to claim that they adopt such practices in the public interest. Their motive is the sordid one of increasing their profits, unmindful of the result to the unfortunate wretch who may ultimately have to stand his trial for murder."

There is enough trial by newspaper in this country already. We shall not encourage that evil practice further by sanctioning oral confessions for the benefit of those elements of the press which seek to profit by pandering to the morbid craving for the sensational and sadistic.

Judgment will be entered vacating the judgment of the Supreme Court of Puerto Rico and remanding the case to that Court for further consistent proceedings.