UNITED STATES

v.

Robert Richard SHIVELY.

Crim. A. No. 25278.

United States District Court
D. Maryland.

May 11, 1961.

Leon H. A. Pierson, U. S. Atty., John R. Hargrove, Asst. U. S. Atty., Dist. of Maryland, Baltimore, Md., for government.

R. Taylor McLean, court-appointed atty., Towson, Md., for defendant.

R. DORSEY WATKINS, District Judge.

Defendant has been indicted on a charge of bank robbery; 18 U.S.C. 2113 (a, b, d, f).

Defendant has filed a motion alleging that he signed a statement "when in the custody of the Federal Bureau of Investigation and believes that such statement will be used against him by the Government in its prosecution of" this case; that "such statement was and is false and inaccurate and was not freely and voluntarily given and signed by the" defendant; and that "such statement was signed by the defendant after unnecessary delay in taking him before the nearest available commissioner after his arrest." At the hearing on the motion it was orally amended to include a claim for the suppression of the "statement" under F.R.Cr.P. Form 16, 18 U.S.C.A.

The Government, with commendable appreciation of the desirability that matters of perhaps decisive importance be investigated in advance of trial, without regard to possible technical objections, has agreed that this motion may properly be heard, before trial, under the provisions of F.R.Cr.P. 12(b) (4), 18 U.S. C.A.

Two primary points are involved: (a) Was defendant arrested "under a warrant issued upon a complaint" and taken "without unnecessary delay before the nearest available commissioner"; and (b) was defendant's statement (in fact a confession) voluntary?

Each of these points raises matters of fact. If upon the evidence the court is required to rule as a matter of law that (a) there was "unnecessary delay" in taking defendant before the nearest available commissioner after arrest upon warrant, during the course of, and as a result of, which unnecessary delay a confession was made, or (b) that the confession whether or not obtained during such judicially determined sacrosanct period was not voluntary, the court would be required to suppress such statement-confession. If the court fails to find either of these—as it does—as a matter of law, they become issues of fact, to be considered by the jury if a jury trial be requested, as all other issues of fact, in accordance with the court's instructions on the law.

For the purpose of this motion, the court finds the following facts:[1]

On or about May 18, 1959, some $19,-000 was stolen from the Parkville Branch of the Equitable Trust Company. On or about May 23, 1960 information was received by the Federal Bureau of Investigation that on that date a person had been seen carrying objects purportedly similar to those used in the 1959 robbery. This person departed in an automobile registered in the name of Bessie Shively, the wife of defendant. At about 2:30 p. m. agents of the F.B.I. arrived at but were unable to obtain any response from the residence of Mrs. Shively. At about 3:35 they returned, and received a response from the occupant that she owned the car in question which had been driven by her husband, who was in the home.

An agent of the F.B.I. then identified himself to her husband, the defendant, and asked him if he would "voluntarily" come to the office of the F.B.I. and talk to him. He agreed. At that time there was no basis for his arrest by the F.B.I.

Defendant, accompanied by two F.B.I. agents, arrived at the Baltimore office of the F.B.I. about 4:20, where interviewing began after defendant had been

---

1. The facts are found based upon the court's observation and evaluation of the witnesses and the exhibits offered. The court's findings represent its appraisal of the preponderance (and in fact the completely persuasive preponderance) of the evidence. There is at least credible evidence from which a jury could so find.

advised of his rights.[2] In the early part of the interview, defendant gave written permission for the search of his house and automobile.[3] Anticipating what such search might develop, directly or through the pursuit of leads so obtained, defendant then "voluntarily"[4] disclosed that he had recently entered into a bigamous marriage; that on the honeymoon he had given a Florida hotel a check on a Baltimore bank in which he knew he did not have funds; and that in 1959, about the time that the Parkville Bank had been robbed, he had given his wife $1,000; and later, that he had given a local food chain store in Baltimore County a bad check.

Defendant's explanation of possession of funds sufficient for such a gift to his wife was that he had won about $4,000 on a daily double at Bel Air in "the latter part of May, 1959." He did not recall the race, the names of the horses or jockeys, but simply that the number of the two entries added up to 13.[5]

Defendant further testified that he was questioned as to whether he had reported his winnings for income tax purposes. His answer was in the negative.

The interview with defendant continued intermittently, the agents pausing as from time to time they sought to verify or disprove the statements made by defendant; e. g. as to his bigamous marriage; the issuance of false checks; and the purported winnings at Bel Air. Sometime between 9 and 10 p. m. of May 23, 1960, the F.B.I. for the first time

learned that there was an outstanding warrant for the arrest of defendant in Baltimore County for an alleged bad check on an A & P store. Defendant was advised of this by the agent in charge of the F.B.I., and that an officer of the Baltimore County police force was on the way to arrest him.

Defendant at no time denied the A & P bad check charge, nor did he request that he be permitted to leave before the arrival of the Baltimore County police. Before the arrival of such police he agreed to take a lie detector test at a future date, and he signed an agreement to that effect. He also agreed to be, and was, photographed and fingerprinted.

A sergeant of the Baltimore County Police arrived at the F.B.I. offices at approximately 10:25 p. m. The sergeant testified that he interviewed defendant, who informed him in detail of his marital problems, and also about the A & P bad check charge. The sergeant advised defendant that he would be taken to the Parkville Police Station. Defendant was in fact booked for investigation, the sergeant testifying that he did not want to book him on the more serious bigamy charge (rather than the check charge) until the State's Attorney had had an opportunity to consider the whole case and give him advice.

During his contacts with and interview by the F.B.I. on May 23, 1960, and before he had been turned over to the Baltimore County Police, defendant did not admit any participation in the Park-

2. That he was entitled to consult counsel; that he did not have to answer any questions; but that if he did, the answers could be used against him.

3. The agreement recites that defendant "having been advised of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such search" authorized a search of his residence and automobile. Defendant admitted his signature to the authorization, but denied having read it, saying he could not have read it without his glasses. The signature is legible, as are two sets of initials,

one placed before one longhand insert, and the other set of initials after a second insert. The agents state positively that defendant gave every appearance of having read the document. On the evidence, and the demeanor of the witnesses, the court finds that this document was read by defendant; and at the least, that a jury could so find.

4. Defendant's own characterization.

5. On cross-examination, one of the F.B.I. agents was asked if he had checked the Bel Air track records. He said that he had; that there was such a winning; but that it had occurred on May 23, 1959, after defendant's display of affluence.

ville Bank robbery, and the F.B.I. did not believe that they had, and they probably did not have, reasonable grounds either for an arrest without a warrant, or for the issuance of a warrant.

At no time prior to the departure of defendant from the F.B.I. offices was he handcuffed, arrested, or put under physical restraint. Defendant admits that he was not told by the F.B.I. that he was under arrest, and that he "voluntarily" answered every question propounded to him in the F.B.I. office, and that he "never objected to anything all the way through."

Early on the afternoon of May 24, 1960, while defendant was in the custody of the Baltimore County Police, agents of the F.B.I. came to the Parkville Police Station to give defendant the lie detector (polygraph) test to which he had agreed. Agent Woods, an experienced and qualified operator, after setting up the machine, explained to defendant that defendant did not have to take the test, nor did he have to talk to Woods or anyone; that if he did, and admitted a crime, this could be used in court; that defendant had the right to an attorney. Woods also explained the way in which the polygraph operated, and advised defendant that if he was guilty it would be better for him not to take the test, but if innocent he should go ahead; that the polygraph was both a lie and truth detector. Defendant said he would like to take the test.

There is a conflict between defendant and the F.B.I. agents as to who were present or in hearing or sight during the test. Defendant claims that several agents were within hearing distance, or were observing through windows. The court finds, and concludes that a jury reasonably could conclude, that the only persons present and/or capable of seeing what transpired were the defendant, and the agents Woods and Rotz. The court feels that a jury could properly accept the testimony of Woods and Rotz that Woods told defendant that when he entered the room, only two knew the truth, the defendant and God; but that shortly three would know—the defendant, God and Woods.[6]

The test began at 1:10 p. m. and was terminated at 3:05 p. m. The test was by no means continuous, as a blood pressure check was employed, that could not exceed three minutes of sustained use; and some five to fifteen minute intervals were used to discuss routine questions and to explain the establishment of a norm, and the significance of any departure therefrom.

Before 3:05 p. m. defendant confessed to the robbery of the Parkville Bank. In connection with "throwing in the sponge" defendant's own words are significant:

"At this particular time, in view of what I have been through, and I can only tell you that I have never been apprehended or held any place in my life; I would have been more than glad to have gone away for a period of two or three or four years to get away from the marital difficulties with my wife; the feeling of being alone, the fact that all of these personal difficulties were at last coming to light, and that I had those things to face, as far as she was concerned, the embarrassment I had created to Grace Tavenner; you might say was more than I could stand." (Transcript, page 63).

After admitting the robbery, defendant was asked to fill in details as to the escape route, etc. (matters which could scarcely have been supplied; let alone suggested, by Woods, who testified that he was not familiar with Baltimore and Baltimore County streets).

Again, defendant's own account of the furnishing of these particulars is significant.

"Q. Now, you stated in your testimony that certain questions were asked, and you would fill in the details. Isn't it a fact, sir, that you

6. No point is, or probably could, be made, of the order of priority or precedence stated.

filled in the details and gave the statement, that is a complete statement which was taken by the agents, rather than the agents asking you certain questions?

"A. I pointed out, and if it was misunderstood as asked before, as near as I can recall the questioning and the writing of the statement goes something like this—when you entered the bank, where did you go, did you stand by the counter, or did you go here; I filled in the details and went along with this thing as near as I could see fit, and I made a statement to that extent. That is the way in which this statement was drawn up all the way through, and I also pointed out that I signed each individual statement of the signed statement." (Transcript, pages 64–65).

A written statement was then prepared. The agents testified that before signing it, defendant was again advised of his rights. Defendant denies any oral advice as to his rights, but admits that he was so advised through the first paragraph of the statement, which statement he read and signed. Again, defendant's own statement as to his supplying of details, and the voluntary nature of his acts, is especially significant.

"A. I don't think there is any question, Mr. Hargrove, about anything that is in there was either filled in by myself, you might say on a voluntary basis through questioning, as to just how this thing had taken place.

"Q. Sir, at the end of giving this statement, you read the statement, did you not? A. Yes sir, I did.

"The Court: I think he said he read and had it read to him.

"Mr. Hargrove: That is what I am asking, sir.

"By Mr. Hargrove:

"Q. Did you indicate to the F.B.I. at that time that there was anything in there which was not true? A. Mr. Hargrove, at that

particular time, when I signed the confession, I was willing to agree to anything and would fill in any missing links one way or the other myself, and I do not deny that. I absolutely do not deny that.

"Q. My question is, the content, such as the rental of the automobile, the escape route used and the various detailed things, those things were supplied by you? A. Those things were filled in, yes sir.

"Q. By you? A. I would assume that they would be, yes sir.

"Q. I am asking you whether they were supplied by you. A. I would say a lot of those are, also including that one.

"Q. Can you tell me, sir, what was not supplied by you? A. As far as I know, the majority of that, Mr. Hargrove, was supplied by me in filling in the pieces on this particular thing." (Transcript, pages 68–70).

After the confession, the United States Attorney's office was consulted, and the confession was reduced to writing; read by and to defendant, and signed by him. On authorization of the United States Attorney's office, a complaint was prepared, and a warrant of arrest was issued. Immediately after the signing of the confession, and just a few minutes before 5 p. m., defendant was advised of the issuance of a Federal warrant. He was promptly taken from the Parkville Police Station to the office of the United States Commissioner in the Post Office Building, Baltimore, Maryland, where he was presented before the Commissioner at 5:42 p. m.

The court finds, and is of the opinion that a jury could properly find, that no inducements were offered to defendant; and no threats were made against him, nor were any statements made intended to, or that did, induce him to confess; and in light of defendant's quoted testimony, the confession was in fact voluntary.

The court is completely unable to accept the argument that the confession resulted from improper pressure brought by the agents in discussing with defendant his criminal activities apart from the alleged bank robbery. Defendant himself disclosed his bigamous marriage, his failure to report his alleged race track winnings, and the bad check given by him to a Florida hotel, drawn on a Maryland bank. He freely admitted that he had issued another bad check in Baltimore County. These involvements were of his own creation, and the pressure, if any, was self-generated. Defendant apparently contends that liability to two Federal and two State charges lead him to superimpose a fictitious fifth offense, involving possible penalties more severe than the other four combined; and that the fifth was invented to escape facing the other four. Of course, the confession did not wipe out the other four offenses, or defendant's liability therefor. Moreover, if he believed that conviction and sentencing for bank robbery might lead to the dropping of the other four charges (although there is not a word of testimony that this possibility was discussed, let alone that any promises were made) this could occur only if the confession were sustained. Even defendant does not assert that he thought that the confession obliterated the other four, so that if the confession were excluded, or he was acquitted, he could not then be tried on the other charges. Defendant's attempted explanation of the confession serves rather to confirm than to discredit the voluntary nature of the confession.[7]

■ Finally, defendant contends that the confession was inadmissible because of unnecessary delay in taking defendant before a Commissioner, contrary to the requirements of Rule 5(a), F.R.Cr.P. Defendant relies on McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; Upshaw v. United States, 1948, 335 U.S. 410, 69 S.Ct. 170, 93 L. Ed. 100; the concurring opinion in United States v. Carignan, 1951, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48; Mallory v. United States, 1957, 354 U.S. 449, 77 S. Ct. 1356, 1 L.Ed.2d 1479; and Spano v. People of State of New York, 1959, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265. No useful purpose would be served by a detailed recitation of the facts distinguishing those cases from this.[8]

In this case, as the findings show, no arrest had been made by the officers or agents of the United States until after the confession, at which time the defendant was, and for approximately seventeen hours had been, in the custody of State authorities, under a State warrant issued and outstanding long before May 23, 1960. Rule 5(a) F.R.Cr.P., therefore is not in terms applicable. Nor was defendant "detained" by the United States, in any ordinary use of that term. As pointed out in the findings, defendant "voluntarily" went to the F.B.I. offices; he at no time attempted, or asked permission to leave; he "voluntarily" answered every question; "he never objected to anything all the way through"; and he agreed to take a lie detector test at a later date, and signed an agreement to that effect. Thereafter he was taken into custody by the Baltimore County Police on an outstanding warrant, and held by them in the Parkville Substation.[9]

It was during such detention that defendant was interviewed and the confession obtained. Accordingly, even if,

---

7. At the trial, the question as to whether the confession was voluntary was submitted to the jury and fully argued. The jury found defendant guilty as charged.

8. E. g., in McNabb, Mallory and Spano, there existed sufficient probable cause for an arrest at the time the interviews were begun; in McNabb and Mallory the defendants were ignorant persons of low mentality; in Upshaw there was a detention for thirty hours to secure a confession.

9. At the trial there was testimony that when an arrest was made by the F.B.I., the Baltimore City Jail, and not Baltimore County facilities, was *always* used for detention.

contrary to the findings, it should be contended that there was an illegal "detention" by the F.B.I., the confession was not obtained during, or as a result of, such detention, but while defendant was legally detained by State authorities.

Rather, the case falls within the rule that statements as to other crimes are not to be excluded because obtained while the defendant is legally in detention on criminal charges. United States v. Carignan, 1951, 342 U.S. 36, 45, 72 S.Ct. 97, 96 L.Ed. 48; Gordon v. United States, 5 Cir., 1959, 268 F.2d 81; Papworth v. United States, 5 Cir., 1958, 256 F.2d 125, 128–129; see also Starks v. United States, 4 Cir., 1959, 264 F.2d 797, 799.

The motion to exclude and suppress the confession is denied.