**Pedro BASTIDAS, Petitioner,**

v.

**Robert J. HENDERSON, Superintendent, Auburn Correctional Facility; Elizabeth Holtzman, District Attorney, Kings County; and Robert Abrams, Attorney General, State of New York, Respondents.**

No. 86 CV 4194.

United States District Court,
E.D. New York.

July 10, 1987.

Philip L. Weinstein, Attorney-in-Charge, The Legal Aid Society Criminal Appeals Bureau, New York City by Abigail Everett, Sr. Supervising Atty., for petitioner.

Elizabeth Holtzman, Dist. Atty., Kings County, Brooklyn, N.Y. by Steven H. Kessler, Asst. Dist. Atty., for respondents.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Petitioner was convicted of murder in the second degree and robbery in the first and second degrees for his participation as the driver of the getaway car used in a robbery in which the victim was killed. In his application for a writ of habeas corpus, 28 U.S.C. § 2254, petitioner asserts that his confession should have been suppressed because it was the involuntary product of police coercion. For the reasons that follow, the application is denied.

## FACTS [1]

Petitioner was stopped by two detectives while he was driving a car that matched the description and license plate number of

---

**1.** At trial, petitioner moved to suppress his confession and the State Court conducted a hearing. Accordingly, we defer to the State Court's findings of "historical" facts, which we believe to be supported by the record. 28 U.S.C. § 2254(d);

*Matusiak v. Kelly,* 786 F.2d 536, 543 (2d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 248, 93 L.Ed.2d 172 (1986). References to the State Court record are indicated by "R."

the getaway vehicle used in a robbery the preceding month. When petitioner pulled over, the detectives parked their unmarked car in front of petitioner's and two uniformed officers called as backup parked their patrol car behind petitioner's car. At Detective Hilda Hubbard's request, petitioner stepped out of the car. Hubbard frisked petitioner and asked for his license and registration. Petitioner produced his license and documents indicating that he owned the car. Then Hubbard said that they needed to go to the police station to check out the car. Petitioner and Hubbard got into the back of Hubbard's car[2] and another officer drove petitioner's car. They took petitioner's car to the 83rd Precinct to secure it and then proceeded to Hubbard's office at the 77th Precinct.

Petitioner and Hubbard arrived at her office at approximately 6:00 p.m. Sometime between 8:00 and 9:00 p.m., Detective Torres arrived from another precinct to interpret for petitioner, who did not speak English very well. In response to questioning,[3] petitioner related an elaborate account of having been robbed, kidnapped, and beaten up on the day of the crime. He denied having been on Pitkin Avenue, the location of the shop that was robbed. Hubbard and Torres left to investigate petitioner's story, during which time petitioner was left alone in Hubbard's office. (R. 27.)

The detectives returned to the precinct house sometime between 2:00 and 4:00 a.m. Petitioner's uncle, Juan Criollo, whom the police had called at petitioner's request, arrived. Before permitting Criollo to see petitioner, they photographed and interviewed him.[4] The interview was tape recorded. Criollo said that petitioner had told him that he, petitioner, had been beaten up and had his car damaged on Pitkin Avenue by three people who apparently had mistaken petitioner for someone else. (R. 406.)

The detectives then showed petitioner the photograph of his uncle and played the tape of the uncle's statement. They pointed out that petitioner had told his uncle that he had been on Pitkin Avenue. Petitioner replied that his uncle was incorrect and essentially maintained his kidnap story. (R. 427.) Then, the detectives brought Criollo in to see petitioner, although petitioner had by then indicated that he did not wish to see his uncle. Upon seeing Criollo, petitioner began to cry. Criollo left, and a short while later petitioner indicated that he wanted to talk to Torres, who had left the room. Torres came back and advised petitioner of his rights in Spanish. Petitioner said that he understood his rights and that he wanted to talk. (R. 130–31, 139.) Thereupon, petitioner confessed to driving the getaway car. (R. 131.)

Later that morning, an Assistant District Attorney arrived to place petitioner under arrest, which apparently Hubbard did not have the authority to do on her own. (R. 113.) Petitioner was readvised of his rights, whereupon he requested counsel and declined to make any further statements. (R. 113–14.)

Following a hearing pursuant to *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), the State Court found that it was unclear whether petitioner had been properly advised of his rights prior to making the first statement, consisting of his kidnap story. The State court found, however, that the statement was voluntary and therefore admissible for im-

---

**2.** Petitioner testified that he was handcuffed. (R. 162.) The State Court rejected his testimony, however, and credited the testimony of Detective Hubbard, who said that petitioner "just came on" and entered the car without being handcuffed or compelled. (R. 91–92.)

**3.** Detective Hubbard testified that prior to the initial questioning she advised petitioner of his *Miranda* rights in English and through Detective Torres in Spanish. (R. 19–21, 24.) Detective Torres testified that he did not advise petitioner

of his rights until much later. (R. 139.) Due to the confusion in the testimony, the State Court made no definitive finding that petitioner was or was not advised at this time. For the purposes of this decision, we assume that he was not advised prior to the initial questioning.

**4.** The detectives photographed Criollo because they thought that he might have been one of the men involved in the robbery. (R. 428–29.)

peachment purposes only.[5] (R. 186–90.) The State did not seek admission of the second statement, consisting of the repeated kidnap story, and so the State Court did not address it. The State Court then found that petitioner had been properly warned of his rights prior to confessing and had voluntarily waived those rights. Accordingly, the State Court held that the confession was admissible on the State's direct case.

## DISCUSSION

Petitioner argues that his waiver of *Miranda* rights was involuntary because the belated *Miranda* warnings came after he had been held in custody for ten hours, was questioned repeatedly, was confronted with evidence of his guilt, and was reduced to tears, all without any significant break in the stream of events.

Whether statements preceded by *Miranda* warnings are admissible requires an examination of the totality of the circumstances to determine whether the accused knowingly and voluntarily chose to forgo his rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Absent deliberately coercive or improper tactics, the administration of *Miranda* warnings permits the conclusion that petitioner's choice to waive his rights was an act of free will. *Oregon v. Elstad*, 470 U.S. 298, 311–18, 105 S.Ct. 1285, 1294–98, 84 L.Ed.2d 222 (1985). Even assuming that petitioner was technically in custody up to and including the time when he confessed, we do not believe that the totality of the circumstances were so coercive as to vitiate the State Court's finding that petitioner knowingly and voluntarily waived his rights and confessed.

Although petitioner remained at the police station for ten hours before being properly advised of his rights, he was questioned only twice before confessing. The periods of questioning were relatively brief and separated by several hours, during which time petitioner was left essentially alone in Hubbard's office. Only two detectives questioned petitioner, and one acted solely as an interpreter. *Cf. Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (relay of interrogators questioned suspect continuously for eight hours). Petitioner was not handcuffed or otherwise forcibly restrained in Hubbard's office, nor was he placed in a holding cell. There is no evidence that he ever asked to leave and was denied permission. There is no suggestion of threats, tricks, ruses, brow beating, or misrepresentations. (*See* R. 188.) That the circumstances were not unduly coercive is confirmed by the fact that petitioner had the presence of mind to invent an elaborate story during the first period of questioning and stood by that story during the second period eight hours later.

Playing the recording of the uncle's statement was not coercive either. Petitioner never even told his trial counsel that the tape had been played. In fact, it appears that trial counsel first learned that the tape had been played to petitioner from the testimony of Detective Hubbard at the trial itself.[6] (*See* R. 398–99.) If the recording had had a strong enough impact on petitioner to overcome his will, we believe that he would have at least mentioned it to his attorney at the pre-trial hearing, which directly addressed the circumstances leading to petitioner's confession.

Furthermore, the content of the tape was not so incriminating as to overcome petitioner's will to resist. The only inconsistency between the uncle's statement and petitioner's story concerned petitioner's presence on Pitkin Avenue. The uncle did not state that petitioner was at the scene of the crime or otherwise implicate him. In fact, petitioner stuck by his original story

5. The State Court reached this conclusion despite the fact that it found that petitioner was not in custody (R. 189–90), in which case *Miranda* warnings were not required. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

6. In light of the revelation that the tape had been played to petitioner, the State Court reopened the suppression hearing. (R. 399–424.)

even after hearing the tape and said that his uncle was wrong.

Although the uncle's visit was undoubtedly traumatic for petitioner, and ultimately may have prompted him to confess, we do not believe that permitting a close family member to visit petitioner was a coercive police tactic offensive to notions of fundamental fairness. Indeed, we believe that family contact would tend to diffuse an otherwise coercive atmosphere. Furthermore, there is no evidence that the meeting was in any way confrontational. The only evidence concerning the substance of any conversation came from the uncle, who stated that they discussed petitioner's need for an attorney.[7]

Petitioner did not cry as a result of anything his uncle or the police said or did, but rather merely as a result of seeing his uncle. (R. 432.) In fact, petitioner's testimony suggests that he confessed because he believed that his uncle could be deported. (R. 445.) There is no evidence, however, that the police threatened petitioner with his uncle's deportation, or even that the police knew the uncle's immigration status.

Accordingly, we agree with the State Court that petitioner's waiver and confession were voluntary. The fact that petitioner subsequently requested an attorney and refused to make further statements is not inconsistent with the conclusion that his initial waiver and confession were voluntary. Having once waived his rights, a suspect may reassert them at any time. *Miranda*, 384 U.S. at 444–45, 86 S.Ct. at 1612. In the present case, petitioner may have merely changed his mind.

## CONCLUSION

Accordingly, petitioner's application must be, and hereby is, denied.

SO ORDERED.

---

**7.** Petitioner testified, however, that he did not request counsel prior to confessing. (R. 163.)