TOMMY AUER *v.* STATE OF INDIANA.

[No. 3-672A10. Filed November 21, 1972. Rehearing denied December 21, 1972.]

*Howard S. Grimm, Jr., Grimm & Grimm,* of Auburn, for appellant.

*Theodore L. Sendak,* Attorney General, *Stephen J. Cuthbert,* for appellee.

STATEMENT ON THE APPEAL

STATON, J.—The jury found Tommy Auer guilty of assault and battery with intent to gratify sexual desires upon a twelve year old girl.[1] The trial court entered a judgment sentencing him to ". . . the Department of Corrections, Indiana Diagnostic Center, for a period of not less than one year nor more than five years. . . ." He filed his "Motion to Correct Errors" which raises these issues upon appeal:

> ISSUE ONE: Is the in-court identification of Tommy Auer tainted? Does the *per se* exclusionary rule announced in *U.S.* v. *Wade* (1967), 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 and *Gilbert* v. *California* (1967), 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 apply to the identification complained of by Tommy Auer?

> ISSUE TWO: Should the trial court have stricken the testimony of the victim's mother which related to the identification of Tommy Auer?

> ISSUE THREE: Should the trial court have granted the motion of Tommy Auer to produce photographs used by the police before his arrest to establish his identification?

We hold that the *per se* exclusionary rule announced in *Wade* and *Gilbert, supra,* is not applicable and that the trial court did not commit reversible error by failing to strike the testimony of the victim's mother and that the trial court did not commit error when it failed to grant Tommy Auer's motion to produce. The judgment of the trial court is affirmed in our opinion that follows:

STATEMENT OF THE FACTS: Mrs. Collins received a telephone call from a man who identified himself as Ted Brooks on May 11, 1971. He stated that he was new in town and would like to hire one of her daughters as a baby-sitter. Mrs. Collins' twelve year old daughter Tami agreed to baby-sit for the caller. Mrs. Collins testified as follows:

---

1. See IC 1971, 35-1-54-4; Ind. Ann. Stat. § 10-403 (Burns 1972 Supp.).

"Q. Will you tell the Court the circumstances which surrounded this person's coming to your door?

"A. You mean leading up to the—

"Q. Right.

"A. I got a phone call about twenty minutes of five. And this man said his name was Ted Brooks, and that he needed a babysitter immediately. He was new in the area and didn't know anyone. And a Mrs. Church had recommended I had two daughters that babysit, and could one of them babysit? And I said, yes, the older girl was in a concert that night, but the younger girl could if she wanted to.

\* \* \*

"MR. HEARN: All right. Was there a time then that this somebody came to your door?

"A. Uh-huh.

"Q. All right. For how long a time did you observe this person?

"A. When he came to the door—I don't know—a matter of maybe five minutes.

"Q. Did you talk with him?

"A. Yes."

The man who identified himself as Ted Brooks over the telephone at 5:00 o'clock P.M. arrived at the home of Mrs. Collins approximately twenty minutes later. He took the twelve year old baby-sitter in his car to a wood near Milford, Indiana and told her to undress. She testified:

"Q. What did he do then?

"A. Then he took down his pants, and he came over, and he started kissing me, and I started screaming, and he put his fingers in my mouth and he—then he told me to get my clothes back on. And then he said to tell my—not to tell my Mom and Dad what happened but just to tell them that his wife had a headache and didn't want to go, and so he was driving—and he gave me two dollars."

She further testified that she noted that he had a gold tooth in the upper right side of his mouth. She testified:

"Q. O.K. When you got home, what was the first thing you did?

"A. Told my Mom.

"Q. Now, since that day on May 11, 1971, have you ever seen that car again?

"A. Yeah. I saw it at the golf course.

"Q. At the golf course?

"A. Yeah.

"Q. And who was with you on that day?

"A. Mr. Holderman and my Mom and Dad."

Mrs. Collins was shown a photograph and identified Tommy Auer but requested to see him in person. She and Tami were taken to a trailer factory in Syracuse, Indiana by Officer Holderman and placed in a darkened office which was located over the factory working area. There she viewed Tommy Auer with approximately six other men and made an identification of him immediately. Tami Collins testified on this identification as follows:

"Q. Did you ever go any place to identify Ted Brooks?

"A. Yes.

"Q. Where was this?

"A. At Cambridge Trailer Factory.

"Q. Cambridge Trailer Factory?

"A. Yes.

"Q. Who did you go with?

"A. Mr. Holderman and my Mom and Dad.

"Q. Where did you go?

      \* \* \*

"Q. Where did you go at the trailer factory?

"A. It was like an office building, but it was up higher, and I looked down through the window.

"Q. You looked down through the window?

"A. Yeah.

"Q. O.K. Did you see some people down there?

"A. Yes. There were about six.

"Q. About six persons? Did you see—did you identify anybody?

"A. Yes. As soon as they started walking, I noticed him from the back.

"Q. You noticed him from the back?

"A. Yes.

"Q. How could you identify him from the back, Tami?

\* \* \*

"A. Because I noticed his hair.

"Q. Anything else that you recognized when you first observed him? Other than his hair?

"A. No. I just knew it was him.

"Q. Just knew it was him. Did there come a time when you got a look at his face?

"A. Yes.

"Q. When would that have been?

"A. Somebody tapped him on the back, and he turned around.

"Q. Somebody tapped him on the back, and he turned around, you said?

"Q. Did you recognize his face?

"A. Yes.

"Q. And who was that person you saw in the trailer factory?

"A. That guy.

"Q. Sitting over here in the—at counsel table?

"A. Yes."

There was further identification by Doris Montague, who was the next door neighbor of Mrs. Collins. She came over to Mrs. Collins' home to borrow some aluminum foil for baked potatoes. She was standing at the door when the alleged Ted Brooks came to pick up Tami. She testified:

"Q. And after you got over to the Collins residence, describe what happened.

"A. This man came to pick up Tami to babysit.

"Q. Did you see this man come?

"A. Yes.

"Q. Where were you standing?

"A. I was standing at her front door.

"Q. How did you happen to be there?

"A. I got up to look.

"Q. All right. And did a man come to the front of the Collins residence?

"A. Yes.

"Q. How did he arrive?

"A. Drove up in front of the house, got out of his car.

"Q. Can you describe that car?

"A. Oh, it was a lime green Chevy. A small car.

"Q. All right. What happened then?

"A. He got out of his car, went around the back of it and came up to the porch and Tami came down the steps, and he went to open the door for her, and it was locked. He went around the back and went through and unlocked the car. And then he got out and stood and talked over the car to Tami's mother and told her that he would have her back by nine or 9:30.

"Q. Do you have any idea how long you observed this person?

"A. Well, it wasn't very long. It didn't take very long to—

"Q. How far away from you was he?

"A. Oh, I imagine ten feet.

"Q. Now, there were a bunch of people around that door, were there not?

"A. Mrs. Collins was on the front porch. She had come out to meet him, ask him if he was Mr. Brooks, and Tami was going off the front porch.

"Q. Who else was standing in the doorway?

"A. I don't remember anyone except Tereasa. Tami's Sister.

"Q. Where exactly in the doorway were you standing—inside the door or outside?

"A. I was standing right inside the door, right smack in front of it.

"Q. Have you ever seen that person again?

"A. I haven't since yesterday. Yesterday I saw him.

"Q. Do you see him here in the Court today?

"A. Yes, I do. Right over there.

"Q. Let the record show the witness identified the Defendant.

"A. Yes.

"Q. Are you sure that's the same person?

"A. Yes.

"Q. How are you so sure?

"A. Because I noticed his face when he came after her that night. I looked at his face, and I can remember it."

STATEMENT OF THE ISSUES: The issues presented by this appeal are:

ISSUE ONE: Were the in-court identifications of Tommy Auer so tainted by the pre-trial lineup at the factory that they should be stricken by the *per se* exclusionary rule announced in *Wade* and *Gilbert, supra?*

ISSUE TWO: The second issue is expressed by Tommy Auer in his brief at page 2:

"Did the Court commit error of law in allowing the witness, Mrs. Basil Collins, to testify concerning her view of the Defendant at a secret lineup, done without his knowledge, prior to his arrest? Further, did the Court commit error in not striking the testimony of the witness, Mrs. Basil Collins, and admonishing the jury not to regard it in determining the guilt or innocence of the Defendant?"

ISSUE THREE: Tommy Auer has expressed the third issue in his brief at page 2 as follows:

"Does the Court commit error of law in not sustaining the Defendant's renewed Motion to Suppress based upon the inability or the failure of the State of Indiana to produce pictures given to the Prosecuting witness for examination for purposes of identifying the perpetrator of the act upon her?"

Tommy Auer is not questioning the identification of Doris Montague who was the neighbor of Mrs. Collins.

STATEMENT ON THE LAW: Issue One. A proper perspective of the present case is needed before discussing the application of "lineup" standards. Tommy Auer was identified by Mrs. Collins and her daughter before any arrest or charge. Both *Wade* and *Gilbert, supra,*

are post-indictment lineup cases where appointed legal counsel was not present.[2] *Dillard* v. *State* (1971), 257 Ind. 282, 274 N.E.2d 387 was an in-custody confrontation case which involved the identification of a handcuffed, bleeding suspect twenty minutes after the Standard Grocery had been robbed.[3] Tommy Auer was not in custody nor was he under arrest or charged at the time of the lineup. This was not a critical stage of the criminal prosecution. The explicit guarantees of the Sixth Amendment were not applicable to this described

2. In *U.S.* v. *Wade* (1967), 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, Wade had been indicted on March 23, 1965 and arrested on April 2, 1965. Legal counsel was appointed to represent him on April 26, 1965. It was not until fifteen days later that the F.B.I. agent without notice to Wade's attorney arranged to have the two bank employees observe Wade in a lineup which was conducted in a courtroom of the local courthouse.

In *Gilbert* v. *California* (1967), 388 U.S. 263, 87 S.Ct. 1951, 18 L. Ed.2d 1178, Gilbert was not placed upon the stage of the Los Angeles Auditorium for a lineup until sixteen days after his indictment and after the appointment of counsel.

3. In *Dillard* v. *State* (1971), 257 Ind. 282, 274 N.E.2d 387, the Defendant conceded that *Wade* and *Gilbert, supra,* had no application to on the scene confrontations between a witness and a suspect conducted within a reasonably short time after the commission of the crime. His defense rests largely upon *Stovall* v. *Denno* (1967), 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, which reaches those cases not covered by *Wade* and *Gilbert, supra.* We will discuss *Stovall, supra,* under Issue Two of this opinion.

In *Martin* v. *State* (1972), 258 Ind. 83, 279 N.E.2d 189, Justice Hunter sets out seven factors to be considered under *U.S.* v. *Wade, supra.* These are:

"(1) Prior opportunity to observe the alleged criminal act;

(2) Existence of any discrepancy between any pre-lineup description and the defendant's actual description;

(3) Any identification of another person prior to the lineup;

(4) Identification of defendant by picture prior to lineup;

(5) Failure to identify the defendant on a prior occasion;

(6) Lapse of time between the alleged act and the lineup description;

(7) Those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup." *Martin, supra,* 279 N.E.2d at 190, 191.

In *Martin, supra,* there was the additional testimony of an accomplice to establish the identification of the defendant. In the present case, there is the testimony of a neighbor, Doris Montague, which is not questioned and clearly establishes the identity of Tommy Auer.

lineup at the factory.[4] The *per se* exclusionary rule announced in *Wade* and *Gilbert, supra,* will not be applied.

In *Kirby* v. *Illinois* (1972), 406 U.S. 682, 92 S. Ct. 1877, 32 L. Ed. 2d 411, two defendants had been stopped by the police. Each had identification items on his person bearing the name "Shard." The arresting officer had learned of a robbery involving a Mr. "Shard" several days before and took both defendants down to the station where they were identified by the victim, Willie Shard. Reviewing *Powell* v. *Alabama* (1932), 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158; and *Coleman* v. *Alabama* (1970), 399 U.S. 1, 90 S. Ct. 1999, 26 L. Ed. 2d 387, as well as other cases touching upon the right to counsel, the Court said that ". . . all of those cases have involved points of time at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby, supra,* 92 S. Ct. at 1882. The Court went on to explain that:

> "The initiation of judicial criminal proceedings is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the Government has committed itself to prosecute, and

4. Fifth Amendment and Fourteenth Amendment rights which are exemplified in the doctrine of *Miranda* v. *Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 should not be confused with the Sixth Amendment and Fourteenth Amendment rights which are set forth in *Wade and Gilbert, supra.* In *Kirby* v. *Illinois* (1972), 406 U.S. 682, 92 S. Ct. 1877, 1881, 32 L.Ed.2d 411, the Supreme Court of the United States found that there was no application. We will discuss *Kirby, supra,* in the body of our opinion. However, the following statement by the Supreme Court of the United States is germane to this footnote:

"It follows that the doctrine of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, has no applicability whatever to the issue before us. For the *Miranda* decision was based exclusively upon the Fifth and Fourteenth Amendment privilege against compulsory self-incrimination, upon the theory that custodial interrogation is inherently coercive.

"The *Wade-Gilbert* exclusionary rule, by contrast, stems from a quite different constitutional guarantee—the guarantee of the right to counsel contained in the Sixth and Fourteenth Amendments. Unless all semblance of principled constitutional adjudication is to be abandoned, therefore, it is to the decisions construing that guarantee that we must look in determining the present controversy."

only then that the adverse positions of Government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable. See Powell v. Alabama, 287 U.S. 45, 66-71; Massiah v. United States, 377 U.S. 201; Spano v. New York, 360 U.S. 315, 324 (Douglas, J., concurring.) "In this case we are asked to import into a routine police investigation an absolute constitutional guarantee historically and rationally applicable only after the onset of formal prosecutorial proceedings. We decline to do so. Less than a year after *Wade* and *Gilbert* were decided the Court explained the rule of those decisions as follows: 'The rationale of those cases was that an accused is entitled to counsel at any 'critical stage of the *prosecution*,' and that a post-indictment lineup is such a 'critical stage.'' (Emphasis supplied.) Simmons v. United States, 390 U.S. 377, 382-383. We decline to depart from that rationale today by imposing a *per se* exclusionary rule upon testimony concerning an identification that took place long before the commencement of any prosecution whatever." *Kirby, supra,* 92 S. Ct. at 1882-1883.

We conclude that no error was committed by the trial court as to Issue One.

ISSUE TWO. Mrs. Basil Collins was allowed to testify as to her secret lineup identification. The trial court neither struck the testimony nor admonished the jury upon objection by Tommy Auer. He contents that this was error. All pre-trial confrontations should be scrutinized. Scrutiny must be balanced between the interests of the suspect being viewed and the interests of society. The Supreme Court of the United States has said that *Stovall* v. *Denno, supra,* strikes such a balance. *Kirby* v. *Illinois, supra.*

The Indiana Supreme Court in *Wright* v. *State* (1972), 259 Ind. 197, 285 N.E.2d 650, 653, referring to *Stovall* v. *Denno, supra,* circumscribed the area of application and set forth this test:

"The test is when looking at the totality of circumstances, whether the . . . confrontation was conducted in a manner so unnecessarily suggestive and conducive to irreparable mistaken identification that it denied the defendant due process of law. . . ."

Guidelines to be used in the application of this test can be found in *Dillard* v. *State, supra,* 274 N.E.2d at 389:

"We believe the *Stovall* test focuses attention on two different sets of facts: (1) The facts bearing on whether the confrontation was conducted in such a fashion as to lead the witness to make a mistaken identification, e.g., how the police asked the witness to attempt the identification, what the witness thought he was doing, the displayed attitude of the police towards the suspect, etc. (2) The facts bearing on how good a chance the witness had to observe the perpetrator of the crime such that any suggestiveness in the conduct of the confrontation could be resisted by the witness and he could make an accurate decision as to whether the man presented was the man who committed the crime. These would include the length of time the witness was in the presence of the perpetrator, the distance of the witness from him, the lighting conditions at the time, capacity for observation by the witness, opportunity to observe particular characteristics of the criminal, etc."

A categorical factual analysis can be constructed under two headings:

1. Confrontation Facts; and

2. Observation Opportunities.

Looking to the facts in the present case, we make this factual analysis.

CONFRONTATION FACTS: Mrs. Collins was taken to Milford, Indiana to view a person whose name was actually Ted Brooks. She viewed this man, that the police identified as Ted Brooks, but she could not identify him as the man who took her daughter away from their home in his automobile on May 11, 1971. After this attempted identification, Mrs. Collins was shown numerous pictures by the police in both

Marshall County and Kosciusko County. She could not identify any of the pictures as the man who called himself Ted Brooks. She was later shown a picture by Officer Holderman. Her testimony as to the showing of this picture is as follows:

"Q. Yeah. And he was told you were in Nappanee. And he had one picture he wanted you to look at?

"A. Yes.

"Q. And did you look at that picture?

"A. Yes.

"Q. And from that picture, did you make an identification?

"A. Yes.

"Q. And that, I take it, was prior in point of time to going to the trailer factory. Is that right?

"A. Yes.

"Q. And when you saw the picture, were you told how old it was? Or—

"A. No.

"Q. — who it was?

"A. No.

"Q. Did he tell you anything or attempt to tell you anything about the person represented by the picture?

"A. Later.

"Q. Later?

"A. Not at that time.

*　*　*

"Q. Was there some talk at the time he showed you the picture about having you see this person in person?

"A. At that time? When I looked at the picture.

"Q. Yes.

"A. I don't think—I don't remember, but I did say I wanted to see that person.

"Q. You what?

"A. I wanted to see the person in the picture in person.

"Q. Why?

"A. Because I—I just wanted to make sure. I was sure of the picture, but I wanted to see that person.

"Q. So then they arranged for you to do that?

"A. Yes.

"Q. Now, when you saw this person which you now identify as Mr. Auer, the next time you were in some little office in a trailer factory, is that right?

"A. That's when we saw him."

No suggestive pressures by the police are present. Any suggestiveness urged from the viewing of just one picture in Nappanee is overcome by the viewing by Mrs. Collins of numerous pictures on previous occasions. When viewing the single picture, she stated that:

"I was sure of the picture, but I wanted to see that person." which strongly demonstrates that Mrs. Collins was not allowing herself to become influenced by any extraneous influences.

Viewing the totality of the circumstances, we conclude that the lineup at the trailer factory was a confirmation of the picture identification already made. This conclusion is further reinforced by Mrs. Collins' immediate identification of Tommy Auer when he turned around at the factory.

OBSERVATION OPPORTUNITIES: Mrs. Collins was standing on her porch when the man identifying himself as Ted Brooks came to pick up her daughter. He was only twenty feet from Mrs. Collins when he got out of his car and came up to Mrs. Collins and identified himself. This was at approximately 5:00 o'clock P.M. on May 11, 1971. It will still daylight so that all of his features could be clearly distinguished. She further observed the man who identified himself as Ted Brooks go back around his car and climb in and unlock the door so that her daughter could get into the car. He then got out of the car and called over the top of the car that he would have her daughter home by 9:30 o'clock P.M. The description that she gave to the police of the man who identified himself as Ted Brooks was the actual description of Tommy Auer. At a pre-trial hearing on the motion to suppress, Mrs. Collins stated that she was basing her identification upon her meeting with Tommy Auer on May 11, 1971 and not upon any photographs or subsequent viewings.

We cannot conclude after looking at the totality of the circumstances that: ". . . the influences were so impellingly suggestive or conducive to misidentification as to result in a denial of due process of law." *Wright* v. *State, supra,* 285 N.E.2d at 653.

ISSUE THREE. Failure of the State to produce other pictures shown Mrs. Collins for the purpose of identifying the man who picked up her twelve year old daughter is the substance of the third issue. The request for these pictures evolved from this exchange between Mr. Hearn, the prosecutor, and Mr. Grimm, Tommy Auer's defense attorney, during a pre-trial hearing on Tommy Auer's motion to suppress:

"THE COURT: In other words, he wants Mr. Holderman, if Mr. Holderman testifies, to have available at the time of cross-examination both pictures he exhibited to the witness.

"MR. HEARN: At which time?

"MR. GRIMM: Well, at any time, because here's the thing I base this on—

"THE COURT: The old pictures of the Defendant?

"MR. GRIMM: No my understanding is from some conversation we had out here at the time of the Deposition—it may not be reflected by the Deposition—was that he had—this conversation was in your presence—had shown these people for identification purposes two photographs, one we believe to have been an old photo of Mr. Auer, the other a photo of some person we don't know. And they evidently were aided in their identification by looking on those two pictures. I thought it would be a proper thing to cross-examine if one bears a resemblance and one doesn't. That sort of narrows the thing and goes to the point I raise in the Motion to Suppress. It was highly suggestive, and it's proper cross-examination.

"MR. HEARN: At this point, the State can say that we believe we can produce the one picture of Mr. Auer. We cannot produce the other.

"THE COURT: Now—

"MR GRIMM: Then I renew my Motion to Suppress.

"THE COURT: When you say you cannot produce, can you tell me what you mean by 'cannot produce'?

"MR. HEARN: I believe from reading the Depositions, Mr. Holderman stated that he picked out a picture that answered the description that was given him by the prosecuting witness. We do not have that picture.

"THE COURT: Now, the pictures—when you say you do not have them, you mean it is not in existence?

"MR. GRIMM: He can't remember which one he used.

"MR. HEARN: He can't remember which one he used.

"THE COURT: Oh. That's O.K. That's what I mean. Defendant—I'm sorry—strike that—order the witness to produce all photographs of the Defendant used and—but will not grant the Motion to Produce any photographs that's impossible to produce, based upon the statement to me that he knows not what photograph was used. But the Motion to—upon the second Motion to Suppress or renewed Motion to Suppress, I will still overrule."

Officer Holderman picked a second picture at random which answered the description of the suspect, Tommy Auer. Officer Holderman does not remember whose picture was used with the old picture of Tommy Auer when he asked Mrs. Collins to identify the man that she saw on the porch of her home. Mrs. Collins testified that she was relying on her observations of Tommy Auer on the porch, an independent source from the picture here in question or the factory lineup, for her in-court identification. A pre-trial discovery is being attempted. The foundation for such a discovery procedure was explained in *Sexton* v. *State* (1972), 257 Ind. 556, 276 N.E.2d 836, 838-839. In *Sexton, supra,* 276 N.E.2d at 838-839, our Supreme Court stated:

"In Dillard v. State (1971), Ind., 274 N.E.2d 387, this Court in a unanimous opinion set out the three major factors to be considered by the trial court in determining the right of a criminal defendant to obtain pre-trial discovery: (1) There must be a sufficient designation of the items sought to be discovered. The motion must set forth the items to be inspected either by individual item or by category, and describe each item and category with reasonable particularity. An item has been designated with 'reasonable particularity' if it enables the appellee to identify the item or category sought and enables the trial court

to determine whether there has been sufficient compliance with this order. Whether a request is set out with 'reasonable particularity' will depend on the facts of each individual case, the crime charged, the nature of the items sought to be discovered, the degree of discovery of other items of information, the nature of the defense, etc. Dillard v. State, *supra;* Howard v. State (1969), 251 Ind. 584, 244 N.E.2d 127.

\* \* \*

"(2) The items sought to be discovered must be material to the defense. It should be considered material to the defense if it appears that it might be 'beneficial in the preparation of the appellant's case.'

\* \* \*

"(3) If the above two requirements are satisfied the trial court must grant discovery unless the State makes a sufficient showing of its paramount interest, if any, in nondisclosure. Bernard v. State, *supra;* Dillard v. State, *supra.*"

These three pre-trial discovery steps must be considered in the light of the facts and circumstances of each case. They may be abbreviated as follows:

(1) Designation of each item sought with reasonable particularity.

(2) The item must be material to the defense or beneficial in preparation of the defense.

(3) Disclosure will be ordered by the court unless the State makes a sufficient showing of its paramount interest for non-disclosure of the item.

The trial court accepted the explanation of the State for non-disclosure. The materiality of the picture to Tommy Auer's defense was not persuasive. Failure to request a hearing waives any error. In *Yeary* v. *State* (1971), 257 Ind. 159, 273 N.E.2d 96, the defendant's counsel requested the production of a statement given to the police by the prosecuting witness. Our Supreme Court held in an opinion written by Chief Justice Arterburn that there was no error where the defendant's counsel failed to request a hearing. Chief Justice Arterburn's opinion in *Yeary, supra,* 273 N.E.2d at 99, 100, stated:

". . . During cross examination by the appellant's counsel of the prosecuting witness, she testified that she had made a statement to the police, concerning the alleged rape. Upon appellant's motion, the court ordered the prosecution to produce the statement. The prosecution did not produce the statement, alleging that it had no such statement. The appellant did not request a hearing on the existence of the statement, as to whether or not the prosecuting attorney had in his possession or under his control such a statement. Under the circumstances we find no error in the trial court's action."[5]

DECISION OF THE COURT: The *per se* exclusionary rule announced in *Wade* and *Gilbert, supra,* does not apply to those defendants who have not been charged by affidavit or indictment with a crime. *Kirby, supra.*

Pre-trial confrontation should be scrutinized. The defendant has not been charged with a crime when these confrontations take place. *Stovall, supra,* strikes the balance between the rights of the suspect and the interests of society. The test set fourth in *Stovall, Wright* and *Dillard, supra,* is to be followed. This test was properly applied and followed in the present case. We find no error.

The pre-trial discovery motions for the production of pictures or other items that will be either material to the defense of the accused or beneficial in the preparation of his defense are governed by three factors. *Sexton* v. *State* and *Dillard* v. *State, supra.* These factors must be considered in the light of the facts and circumstances of each case. These factors are:

(1) Designation of each item sought with reasonable particularity.

5. *Antrobus* v. *State* (1970), 253 Ind. 420, 427, 254 N.E.2d 73 clearly held where a proper foundation was laid and the State claimed the items in question were not within the control of the State that:

". . . The trial court must conduct a hearing on the conflicting claims of the parties to resolve this issue."

As Judge White points out in his opinion in *Sargent* v. *State* (1972), 153 Ind. App. 421, 287 N.E.2d 795, 798 in footnote 5, the conflict between *Antrobus, supra,* and *Yeary, supra,* appears to be unresolved. As *Yeary, supra,* is the later opinion, this Court should consistently follow *Yeary* until there is some further clarification from the Supreme Court.

(2) The item must be material to the defense or beneficial in the preparation of the defense.

(3) Disclosure will be ordered by the Court unless the State makes a sufficient showing of its paramount interest for non-disclosure of the item.

If a motion for disclosure of an item is denied or if the defendant is not satisfied with the State's response for non-disclosure, a request for a separate hearing must be made. *Yeary* v. *State, supra.* No such request was made here.

The judgment of the trial court should be and the same hereby is affirmed.

Hoffman, C.J. and Sharp, J., concur.

NOTE.—Reported at 289 N.E.2d 321.