**Marvin PINKNEY, Petitioner,**

v.

**John KEANE, etc., Respondents.**

**No. 89 CV 734 (ERK).**

United States District Court, E.D. New York.

May 10, 1990.

Lipsitz, Green, Fahringer, Roll, Schuller & James, New York City by Diarmuid White, Herald Price Fahringer, for petitioner.

Michael O'Brien, Asst. Dist. Atty., John J. Santucci, Dist. Atty. of Queens County, Queens, N.Y., for respondents.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

On October 1, 1981, at approximately 4:45 p.m., Andrew Kalina, the proprietor of a liquor store at 44–24 College Point Boulevard, Queens, New York, was shot to death during an armed robbery. By 6:45 p.m. that same day, the New York City Police had found petitioner, Marvin Pinkney, at Jamaica Hospital receiving medical attention for wounds he incurred while escaping, had recovered the murder weapon from petitioner's car parked a short distance from the hospital, and had brought the four persons who witnessed petitioner's escape from the scene of the crime to the hospital to identify him.

On the basis of this and other compelling evidence, petitioner was convicted of murder in the second degree by a jury sitting in the Supreme Court of the State of New York, Queens County, and he was sentenced to a term of imprisonment of twenty-five years to life. The judgment of conviction was affirmed by the Appellate Division, *People v. Pinkney*, 135 A.D.2d 748, 522 N.Y.S.2d 653 (2nd Dep't 1987), and a motion for leave to appeal to the Court of Appeals was denied by Judge Simons on May 17, 1988. *People v. Pinkney*, 71 N.Y.2d 1031, 526 N.E.2d 59, 530 N.Y.S.2d 566 (1988).

On appeal from the judgment of conviction, petitioner argued that the trial judge erroneously admitted into evidence the murder weapon that was obtained as a result of the unlawful search of his car. Petitioner also argued that the eyewitness identifications of him at Jamaica Hospital were unnecessarily suggestive and that the eyewitnesses should not have been permitted to testify at trial. Even if the eyewitness testimony was admissible, petitioner argued that the trial judge improperly refused to allow his attorney to comment in his summation on the suggestive nature of the pre-trial identifications.

The Appellate Division agreed with petitioner that the search of his automobile was invalid because it "was neither supported by probable cause nor justified by exigent circumstances or any other exception to the exclusionary rule." *People v. Pinkney*, 135 A.D.2d at 749, 522 N.Y.S.2d at 654 (citations omitted). Although this conclusion resulted in the reversal of petitioner's conviction for the illegal possession of two firearms found in the car, one of which was the murder weapon, the Appellate Division affirmed petitioner's murder conviction on the ground that the eyewitness identifications and other physical evidence that had been properly obtained were so compelling as to render harmless the admission of the fruits of the search of the vehicle. *Id.* at 749–50, 522 N.Y.S.2d at 654–55. The Appellate Division did not address petitioner's argument that the trial judge had improperly restricted the effort of his attorney to argue to the jury that the eyewitness identifications were unreliable. The Appellate Division also did not address petitioner's argument that the trial judge erroneously admitted evidence of petitioner's refusal to answer questions after he had been arrested and given his *Miranda* warnings.

Petitioner now seeks habeas corpus relief pursuant to 28 U.S.C. § 2254. While the claims of error he presses, i.e., the admissibility of the eyewitness identifications, the inability of his attorney to attack the reliability of the identifications in his summation and the admissibility of evidence of his post-arrest silence, have substantial merit, there is no need to resolve them here. A careful review of the record indicates that the Appellate Division erred when it concluded that the search of petitioner's automobile was invalid. Because the evidence found in the automobile and other evidence properly admitted renders harmless the errors petitioner alleges were made at trial, the petition must be denied.

## Discussion

### A. *The Validity of the Search of Petitioner's Car*

The facts leading to the discovery of the murder weapon in an open leather bag in petitioner's car are set out in the findings of fact made by the trial judge. In pertinent part, they are as follows:

On October 1, 1981, at approximately 4:45 p.m., Andrew Kalina, the proprietor of a liquor store, at 44–24 College Point Boulevard, Queens, was shot, and died shortly thereafter.

The first police car to arrive on the scene was operated by Police Officer Joseph Costanza of the 109th Precinct, who was responding to a Robbery in Progress at that location. Upon arriving, he observed that the front door was open with its glass broken, much of it on the outside of the door, and to a lesser extent, some on the inside. He observed that there was a trail of blood leading away from the door for about ten feet onto the street. He also saw the body of Mr. Kalina about twenty feet inside the store, and did not notice any blood in Kalina's vicinity.

Also responding to the scene, as a result of a radio transmission that a man had been shot, was Detective Stanley Struel of the 109th Precinct who observed that the glass of the liquor store door had been shattered. He also observed blood where the shattered glass was. Struel also saw the body of Kalina inside the store. He then notified all hospitals in an effort to determine if anyone could have been seeking treatment for injuries. Subsequently he learned a possible suspect was in Jamaica Hospital and responded there. Detective Richard Ward of the 109th Precinct responded to the location of the liquor store where he noted blood on the sidewalk and on the glass. Detective Ward interviewed witnesses at the scene namely Maurice McFarlane, Kimberly Auffray, and Thierry Auffray. Detective Struel interviewed Leonardo Mesa.

\*     \*     \*     \*     \*     \*

Another witness to testify was Stanley Zadwydos, who stated that shortly before 5:00 p.m. on October 1, 1981, he was driving on the Interboro Parkway near Queens Boulevard when his car was involved in an accident with a foreign car driven by the defendant. The witness copied the defendant's license plate number. The defendant fled the scene in his car and the witness pursued him. After the defendant's car became stuck in traffic, the witness' car caught up to the defendant's car. At that point the defendant came face to face with the witness. The witness testified that the defendant stated that he was bleeding and was going directly to a hospital. The witness attempted to follow the defendant but lost him because the defendant was going at too great a speed. The witness then gave police officers Gerald Goodman and Donald Myerhoff the license number of the car and informed them of the accident. The police ran a check of the license number and stated that the owner was Marvin Pinkney.

At approximately 5:15 p.m., Officers William Fitzpatrick and Thomas McGovern of the 102nd Precinct were told over the police radio to go to the Jamaica Hospital Emergency Room. They were told a description of a perpetrator of a robbery, namely, a male black, dark clothing, dark hat, glasses, and about 6' to 6'2." They were told he might be injured. As they entered the ramp lead-

ing to the emergency room of the hospital, they noticed footprints of blood. The officers followed the prints into the emergency room to where a man was being treated for a leg injury. In response to a question by McGovern, he stated he had been mugged by two white men, and had walked to the hospital. McGovern stayed with the defendant who identified himself to McGovern as Marvin Pinkney, while Fitzpatrick followed the trail of blood. While tracing the blood, Fitzpatrick met Officers Goodman and Myerhoff, who informed him that they were looking for a Marvin Pinkney who had left the scene of an accident. Fitzpatrick said he did not know the name Marvin Pinkney. Fitzpatrick traced the trail of blood for about 1½ blocks to a yellow Toyota that had damage to its front and rear. He found the Toyota on a public street with keys laying on the hood of the car. He took the keys. Fitzpatrick noticed that the doors were unlocked. He opened the car door and saw a pool of blood inside the car on the driver's side. He then exited the car and looked in the passenger side window. He then noticed an open bag with the handle of a gun protruding out of it. He then opened the car door and seized the bag which he then saw had two guns in it.

Memorandum and Order Denying Defendant's Motion to Suppress Evidence, *People v. Pinkney*, No. 2614/81 (N.Y. Supreme Court October 25, 1982) (Zelman, J.).

Petitioner acknowledges that these findings, "as far as they go, are presumed to be correct." Post–Argument Memorandum of Law, *People v. Pinkney*, No. 89–734 (E.D.N.Y. June 23, 1989) (hereinafter "Post–Argument Memorandum") at 10 (citing 28 U.S.C. § 2254(d)). The one fact that is conceded to have been omitted by the trial judge in her findings of fact is that Officer Fitzpatrick first observed the bag containing the guns while he was inside the car. Specifically, Officer Fitzpatrick testified that he observed a brown leather bag "on the passenger side of the rear on the floor" as he "was starting to back out of the car." Transcript of *Mapp* Hearing,

*People v. Pinkney*, No. 2614/81 (N.Y. Supreme Court, April 14, 1982 and October 12, 1982) (hereinafter "Tr.") at 61. Officer Fitzpatrick then got out of the car and "went around to the passenger side and looked through the window." *Id.* At that point, he "could see the handle of a gun protruding from the bag." *Id.* Although Officer Fitzpatrick's initial entry into the automobile enabled him to see no more than was visible through the window of the unlocked automobile, petitioner alleges that his entry into the vehicle was a "search" within the meaning of the Fourth Amendment. Petitioner argues that, in the absence of a warrant or probable cause, Officer Fitzpatrick's observation of the leather bag was the fruit of an impermissible search.

While petitioner's characterization of the entry into the vehicle as a search may be correct, *New York v. Class*, 475 U.S. 106, 114–15, 106 S.Ct. 960, 966, 89 L.Ed.2d 81 (1986), this alone does not entitle petitioner to prevail. It is well-established that a warrantless search of an automobile is permissible if based on probable cause. *See e.g. Michigan v. Thomas*, 458 U.S. 259, 261, 102 S.Ct. 3079, 3080, 73 L.Ed.2d 750 (1982) ("[T]he justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.") (footnote and citation omitted); *see also California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985); *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974).

Petitioner's reliance upon the Supreme Court's holding in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), is misplaced. In *Coolidge*, a warrantless search of a vehicle was invalidated because the police entered "private property to seize and search an unoccupied, parked vehicle not then being used for an illegal purpose." *Id.* at 463 n. 20, 91

S.Ct. at 2036 n. 20. The Supreme Court has never applied the holding in *Coolidge* beyond its facts and, if it survives today at all, it stands as authority for the narrow proposition that a warrant is required to search an automobile only where entry on to private property is necessary to effectuate the search. *See Cardwell v. Lewis*, 417 U.S. at 593, 94 S.Ct. at 2470; *United States v. Bagley*, 772 F.2d 482 (9th Cir.1985), *cert. denied*, 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986); *United States v. McBee*, 659 F.2d 1302, 1305 n. 5 (5th Cir. 1981), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982); 3 LaFave, *Search and Seizure* § 7.2(b), at 39 (1987).

Accordingly, the threshold issue in assessing the reasonableness of Officer Fitzpatrick's "search" of petitioner's car is whether there was probable cause to believe that *petitioner had committed an armed robbery and that weapons or the proceeds of the robbery would be found in a vehicle that petitioner had hastily abandoned in order to seek medical care for wounds incurred during the commission of the offense.*

■ Probable cause is not the equivalent of a prima facie case. *Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983). Rather, it requires only facts sufficient to " 'warrant a man of reasonable caution in the belief' " that evidence of a crime will be found in the place to be searched; "it does not demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). As the Supreme Court has repeatedly emphasized:

In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. ... The rule of probable cause is a practical, nontechnical conception....

*Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).[1]

■ The test for probable cause was satisfied here. After arriving at the scene of the crime, it immediately became apparent to the New York City Police that the perpetrator of the robbery was seriously injured in making his escape and that he would likely seek medical attention at nearby hospitals. Petitioner was admitted to Jamaica Hospital less than thirty minutes after the robbery. Officer Fitzpatrick, who was then dispatched to Jamaica Hospital, received two messages on his car radio prior to arriving at Jamaica Hospital. The first advised him to investigate an "aided at Jamaica Hospital." Tr. at 50. An "aided" meant that there was "an injured party at Jamaica Hospital" and he was "to find out the cause of the injury." *Id.* Officer Fitzpatrick understood that such an investigation is normally instigated by hospital authorities because "they consider it suspicious and the hospital calls the precinct." *Id.*

Subsequently, before Officer Fitzpatrick arrived at Jamaica Hospital, the dispatcher got back "on the air and told us to use caution, that the aided might have been involved with an armed robbery in the 109th." *Id.* at 51. The dispatcher gave a description of the perpetrator and Officer Fitzpatrick also recalled being asked to

1. "The probable cause test ... is an objective one; for there to be probable cause, the facts must be such as would warrant a belief by 'a prudent man,' 'a man of reasonable caution,' or 'a reasonable discrete and prudent man.' ... [I]f the objective probable cause test is met it is not also necessary to establish that the particular officer making the arrest or search subjectively believed probable cause was present." 1 LaFave and Israel, *Criminal Procedure* § 3.3, at 188 (1984) (footnotes omitted); *see Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985); *United States v. Roy*, 869 F.2d 1427, 1432–33 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 72, 107 L.Ed.2d 38 (1989); *United States v. Gray*, 659 F.2d 1296, 1300 (5th Cir.1981). Accordingly, the inability of Officer Fitzpatrick to say what he was looking for when he opened the door to the car, Tr. 739–43, is not material to the issue of whether there was probable cause to search the car.

check "about broken glass." *Id.* When he arrived at the entrance to the emergency room of the hospital, Officer Fitzpatrick noticed blood-stained footprints on the ramp that led into the emergency room where petitioner was being treated for a serious wound in the leg. *Id.* at 52.

Petitioner then told Officer Fitzpatrick that he had been robbed by two white men on the Van Wyck service road and that he had walked from there to Jamaica Hospital for treatment. *Id.* at 54–55. Officer Fitzpatrick suspected that petitioner was not telling the truth because petitioner's statement that "he came down the Van Wyck Expressway service road and into the emergency room" was not consistent with his observation of the direction from which the footprints appeared to be coming. *Id.* at 724. Specifically, "when he originally entered the emergency room," Officer Fitzpatrick "noticed the blood prints coming through the parking lot. From another direction." *Id.*

Officer Fitzpatrick then left petitioner and began retracing the path created by the blood-stained footprints. He found that they led to a car parked a block and a half from the hospital on 91st Avenue and 135th Street. *Id.* at 58. When he "looked into the car through the window," Officer Fitzpatrick "could see a pool of blood on the driver's side." *Id.* at 58–59. This confirmed his suspicion that petitioner had lied about the location of the alleged robbery and that he had walked to Jamaica Hospital from where he was attacked. Even petitioner concedes that it was reasonable for Officer Fitzpatrick to then conclude that petitioner "had given the police a false explanation for his injury." Post–Argument Memorandum at 17.

Moreover, the fact that petitioner parked his car a block and a half away, rather then drive directly to the entrance of Jamaica Hospital, raised additional doubts about the cause of petitioner's injury. A reasonable police officer could assume that there was something about the car or its contents that petitioner thought would be discovered if he drove the car to the door of the emergency room in his bloodied condition. Indeed, the Appellate Division cited the fact that petitioner "parked his car two blocks from the hospital and walked to the emergency room, although bleeding profusely from the leg," as evidence demonstrating consciousness of guilt. *People v. Pinkney*, 135 A.D.2d at 750; 522 N.Y.S.2d at 655.

Petitioner maintains, however, that an apparently false explanation for an injury given by a patient in an emergency room is not enough to establish probable cause. This argument ignores the fact that petitioner's explanation, besides being false, constituted present evidence of "consciousness of wrongdoing." Post–Argument Memorandum at 17. When this is "coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime," *Sibron v. New York*, 392 U.S. 40, 66, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968), there is probable cause to search.

The record is replete with "specific knowledge" linking petitioner to "evidence of crime." The armed robbery that petitioner was suspected of committing took place only three and a half miles from Jamaica Hospital. Petitioner sought treatment there for a badly bleeding cut on his leg less than thirty minutes after the perpetrator of the armed robbery fled the scene of the crime, cut by glass and bleeding profusely. While Officer Fitzpatrick did not know the basis for the information he had received, that petitioner "might have been involved in an armed robbery in the 109th," there was a factual basis for that information and, hence, he was entitled to rely on it. *United States v. Hensley*, 469 U.S. 221, 229–33, 105 S.Ct. 675, 680–82, 83 L.Ed.2d 604 (1985); *United States v. Robinson*, 536 F.2d 1298, 1299–1300 (9th Cir.1976). Accordingly, when he encountered petitioner, who fit the general physical description of the suspect,[2] he

---

2. Officer Fitzpatrick was not asked at the suppression hearing whether petitioner fit the description that had come over the radio or whether he had seen the clothing petitioner was wearing when he was admitted to the hospital. There is no dispute that petitioner fit the general description of a black male, about six feet or six feet two inches tall. Furthermore, petitioner

could assume that there was reason to believe that petitioner had committed an armed robbery. Just as a credible explanation at that point would have eliminated any suspicion, an explanation that was contradicted by the available evidence aroused suspicion and confirmed that petitioner was the suspect that Officer Fitzpatrick was sent to Jamaica Hospital to find.

Two Court of Appeals' cases illustrate when an explanation not found to be credible by a police officer will give rise to probable cause. In *United States ex rel. Molloy v. Follette*, 391 F.2d 231, 232 (2d Cir.), *cert. denied*, 391 U.S. 917, 88 S.Ct. 1812, 20 L.Ed.2d 658 (1968) (Friendly, J.), the arresting officer, Detective Gagliardi, received a call on his car radio to proceed to 871 Flatbush Avenue "where there were prowlers." At some point after he arrived, he saw Molloy on the roof of 12 Martense Street, one hundred feet north of 871 Flatbush Avenue.

> Somehow Gagliardi got to the roof of 12 Martense St. and asked Molloy what he was doing there. Molloy responded that he had had a fight on the street, and, to get away from his assailants, had gone to the roof "to find a place to sleep." Finding this explanation not wholly convincing, Gagliardi "took him * * * down into the street" and questioned him again. When this produced the same answers, Gagliardi placed Molloy under arrest, searched him and seized a registration for a 1957 Oldsmobile with plates numbered AD 5717. He then "searched the area and found one John Herbert Smith secreted under the front dashboard of an automobile parked in front of 12 Martense Street," with license plates of the same number.

*Id.* at 232 (footnote omitted).

In addressing the issue of probable cause, Judge Friendly observed that:

> [I]f Detective Gagliardi had reasonable cause to believe that a felony had been committed at 12 Martense St., 871 Flatbush Ave., or elsewhere in the neighbor-

hood, at least if there was possible access between the locus of the crime and the place where Molloy was found, Molloy's presence on a roof top and his absurd explanation gave sufficient reason for believing he had committed the crime to justify his arrest.

*Id.* at 232–33. Because the record was silent on this issue, the case was remanded to give the State "an opportunity to cure this deficiency, e.g., by furnishing further evidence of what burglary had been reported and where and when, and the physical relationship of the locus to 12 Martense St." *Id.* at 233 (footnote omitted). By contrast, the facts found critical by Judge Friendly to establish probable cause are present in the record here. Before Officer Fitzpatrick followed petitioner's bloody footprints to his car, the New York City Police knew when and where the armed robbery occurred in relation to when and where petitioner was found. Petitioner's presence at the hospital and the evidence of consciousness of guilt sufficiently tied him to that crime to establish probable cause.

Certainly, the facts here are stronger than those in *United States ex rel. McCullers v. McMann*, 370 F.2d 757 (2nd Cir. 1967). In *McCullers*, the Court of Appeals held that there was probable cause to arrest a defendant who was waiting for a bus a few blocks from the scene of a late evening burglary and who told the arresting officer he had been playing poker with persons he could not name. Particular emphasis was placed on the fact "that the police officers knew that a felony had been committed. They were not proceeding merely on the basis of the suspicious circumstances in which the appellant was found." *Id.* at 759. This is precisely the case here.

Even if Officer Fitzpatrick possessed only reasonable suspicion and not probable cause, it is not entirely clear that his inspection of petitioner's car was unreasonable. Petitioner had left his car unlocked on a public street, where it was subject to

---

testified that his clothes, which likewise fit the description, were on a chair near the bed on which he was being treated, Tr. at 798, 816–17,

and they clearly would have been visible to Officer Fitzpatrick.

being vandalized while he received emergency medical care. A cursory inspection of the vehicle to ensure that there were no weapons or evidence that might be stolen or removed would not appear to be unreasonable where the intrusion was minimal and only in an area in which petitioner had manifested a limited expectation of privacy. Indeed, because this case involves an unlocked and unoccupied vehicle left in a public place, the invasion of privacy here was much less significant than in *New York v. Class*, 475 U.S. 106, 119, 106 S.Ct. 960, 968, 89 L.Ed.2d 81 (1986), which involved an entry into a vehicle that had been driven by its owner when it was stopped for a traffic infraction.[3]

■ While the Supreme Court has yet to uphold a search on reasonable suspicion "merely because it was minimally intrusive," *United States v. Colyer*, 878 F.2d 469, 479 (D.C.Cir.1989), the minimal nature of an intrusion is obviously of considerable significance in determining the reasonableness of a search. *See United States v. D'Avanzo*, 443 F.2d 1224, 1226 (2d Cir.), *cert. denied*, 404 U.S. 850, 92 S.Ct. 86, 88, 30 L.Ed.2d 89 (1971). This consideration, along with the possibility that weapons might have been left in the car, arguably brings this case within the narrow exception permitting a search even in the absence of probable cause to believe that evidence of a crime or contraband would be found. *See Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973);[4] *Cf. Arizona v. Hicks*, 480 U.S. 321, 327, 107 S.Ct. 1149, 1154, 94 L.Ed.2d 347 (1987) (Seizure can be justified on less than probable cause "where, for example, the seizure is minimally intrusive and operational nec-

essities render it the only practicable means of detecting certain types of crime."); *United States v. Prazak*, 500 F.2d 1216, 1217 (9th Cir.1974) (Police officer's act in opening locked trunk of car to put in a coat removed from the rear seat was justified as a reasonable means of securing the automobile and its contents). Because this issue was not addressed by the parties and because there was probable cause for the search, it is not necessary or appropriate to decide the case on this ground.[5]

■ Even if the Appellate Division erroneously concluded that the search of his car violated the Fourth Amendment, petitioner argues that the District Attorney is collaterally estopped from relitigating the validity of the search of the automobile. This argument is without merit. The application of the doctrine of collateral estoppel is not required here by the full faith and credit statute, 28 U.S.C. § 1738, or by the Due Process Clause.

■ Under New York law, a party who has obtained a final judgment in its favor is not normally precluded from relitigating a subsidiary issue that was decided against it. As Professor Siegel has observed in explaining the predicament in which such a party finds itself:

> What could he do when the court found against him on that issue? He apparently could not appeal, because final judgment nonetheless went in his favor. As the winner, H would presumably lack aggrieved status sufficient to take an appeal, with the result that the adverse finding … would stand against him without his being able to secure appellate review.

---

**3.** The record in *Class* "reveal[ed] no reason for the officer to suspect other criminal activity or to act to protect his own safety. The sole predicate for the officer's action here was defendant's commission of an ordinary traffic infraction…." *People v. Class*, 63 N.Y.2d 491, 496, 472 N.E.2d 1009, 1012, 483 N.Y.S.2d 181, 184 (1984) (citations omitted).

**4.** In *Cady v. Dombrowski, supra,* there was probable cause to believe that there was a weapon in the car. Because the defendant was an off-duty police officer who was lawfully in possession of the weapon, "the search could not be explained

as a search for evidence or contraband" of the kind that would be justified under the automobile search exception. Saltzberg, *American Criminal Procedure* 274-75 (1988).

**5.** Similarly, because testimony at the suppression hearing did not develop a factual basis for the application of the inevitable discovery exception to the exclusionary rule, it is not appropriate to rule on the issue of whether the weapons ultimately would have been lawfully seized even if Office Fitzpatrick had not entered the vehicle when he did.

Siegel, *New York Practice* 615 (1978). Professor Siegel suggests that such a result is unacceptable in New York:

A full day in court in New York practice includes the appellate process if the loser wants it, and a situation in which appeal is foreclosed can thus be regarded as an inadequate day in court. The Restatement takes that position, too, holding that the estoppel will not apply against a person who could not have obtained appellate review of the judgment. Perhaps the logical denouement here is that an estoppel will not operate on any issue which was decided against the winner in the first action.

*Id.* at 615–16 (footnote omitted).

While Professor Siegel was speaking in the context of a civil case, a similar analysis has been applied in criminal cases in which this issue sometimes arises, i.e., where a defendant prevails at a suppression hearing at a trial for bank robbery and is subsequently indicted for stealing a getaway car.[6] In such a case, as Judge Friendly has written:

Assuming that the state has had an opportunity for a full hearing on suppression and at least one appeal as of right, we think due process would forbid relitigation of the issue determined adversely to it, although not, of course, the prosecution of X for auto theft on the basis of other evidence.

*United States ex rel. DiGiangiemo v. Regan,* 528 F.2d 1262, 1266 (2d Cir.1975), *cert. denied sub nom. DiGiangiemo v. Olgiatti,* 426 U.S. 950, 96 S.Ct. 3172, 49 L.Ed.2d 1187 (1976).

Because the District Attorney prevailed here in sustaining petitioner's conviction for murder in the second degree, he could not appeal from the judgment affirming the conviction on the ground that the Appellate Division erred in its finding on the

subsidiary issue regarding the validity of the search of the car. The Appellate Division did reverse the conviction of petitioner for illegal possession of the weapons found in the automobile. The District Attorney, however, had no reason to seek leave to appeal from that decision because the sentence ran concurrently with the 25 years to life sentence for the murder conviction that was affirmed.[7] For that very reason it is unlikely that the New York Court of Appeals would have granted such a leave application.

More significantly, the present case is different from the hypothetical that Judge Friendly was addressing in *DiGiangiemo.* There it was the District Attorney who initiated a second criminal prosecution arising out of the same nucleus of facts as the first prosecution. Under these circumstances, the Due Process Clause was thought to preclude relitigation of the issue of the admissibility of evidence that had been decided adversely to the District Attorney in the earlier proceeding.

The present habeas corpus application is simply another stage of the same case. It is akin to an appeal by petitioner from the affirmance of the judgment of conviction by the Appellate Division. If the New York Court of Appeals had granted petitioner leave to appeal from the judgment affirming the conviction for murder in the second degree, the Due Process Clause would not have precluded the District Attorney from arguing that the search of the car was valid as an alternative basis for affirmance. There is no reason why the District Attorney should be in a worse position here.

The same discretion implicit in the statutory command that the judge "dispose of the matter as law and justice require," 28 U.S.C. § 2243; *Stone v. Powell,* 428 U.S.

---

**6.** The New York Court of Appeals has not been sympathetic to the application of the doctrine of collateral estoppel in criminal cases. *See e.g. People v. Plevy,* 52 N.Y.2d 58, 65 n. 4, 417 N.E.2d 518, 522 n. 4, 436 N.Y.S.2d 224, 228 n. 4 (1980).

**7.** A determination of whether the first action or proceeding genuinely provided a full and fair opportunity requires consideration of "the 'realities of the [prior] litigation,' including the context and other circumstances which ... may have had the practical effect of discouraging or deterring a party from fully litigating the determination which is now asserted against him." *People v. Plevy,* 52 N.Y.2d 58, 65, 417 N.E.2d 518, 522, 436 N.Y.S.2d 224, 228 (1980) (citations omitted).

465, 478 n. 11, 96 S.Ct. 3037, 3044 n. 11, 49 L.Ed.2d 1067 (1976), and that permits the denial of habeas corpus relief in a case in which the Appellate Division has erroneously determined that the Fourth Amendment was *not* violated, *Stone v. Powell*, 428 U.S. at 477–82, 96 S.Ct. at 3044–46, surely permits the denial of habeas corpus relief where one of the predicates for that relief is an erroneous finding by the Appellate Division that the Fourth Amendment was violated. Indeed, because the considerations underlying the doctrine of collateral estoppel are less compelling in criminal cases, "where the pre-eminent concern is to reach a correct result and where other considerations peculiar to the criminal process may outweigh the need to avoid repetitive litigation," *People v. Plevy*, 52 N.Y.2d 58, 64, 417 N.E.2d 518, 521–22, 436 N.Y.S.2d 224, 227–28, it is particularly appropriate to exercise the discretion vested by 28 U.S.C. § 2243 to decline to preclude the District Attorney from arguing that the judgment of conviction should be sustained on the ground that the Appellate Division erroneously decided that the Fourth Amendment was violated.

B. *The Effect of the Other Errors Alleged By Petitioner*

■ The evidence against petitioner established his guilt beyond a shadow of a doubt. This evidence, aside from the murder weapon found in his car, is summarized in the opinion of the Appellate Division:

Four witnesses testified at the trial that they were in the parking lot of a shopping mall when they heard the glass door of a liquor store shatter and saw a man, later identified as the defendant, running out of the store. All had a good opportunity to view this man, were able to see his face, and later gave police rather detailed descriptions of this man and of his clothing. One of these witnesses saw the man putting something inside his coat (the others simply saw him with his hand inside his coat) and watched him get into a car and drive off. Several of the witnesses then walked over to the store and saw blood and a man lying on the floor inside. The man on the floor was Andrew Kalina, and he had been shot dead by a .22 caliber bullet. A second, deformed .22 caliber bullet was also found next to Kalina. A fifth witness testified that on the day of the incident he was in his apartment above the liquor store when he heard two gunshots followed by the sound of breaking glass. He went downstairs and found Kalina lying on the floor of the liquor store.

Shortly after this incident, the original four witnesses were brought by police to a hospital where three of them identified the defendant as the man they had seen running from the liquor store and also identified various articles of his clothing as those worn by the man that they had seen. The fourth witness identified certain of the defendant's physical features and certain articles of his clothing as similar to those of the man at the liquor store. One of these witnesses also identified the defendant's car, which was parked outside, as the one in which the man at the scene of the crime had driven away. Yet another witness, who had been involved in a hit-and-run accident with the defendant when the defendant was driving himself to the hospital and who was able to get the license number of the defendant's car and report the incident to the police, was also brought to the hospital by the police and was able to identify the defendant and his car. Other admissable evidence linking the defendant to the crime of murder in the second degree was that the blood samples found on the glass fragments of the liquor store's door and on the defendant's car and clothing were genetically consistent with each other but not with a sample of Kalina's blood, and that the genetic factors found in this blood occur in only 6% of the population. Finally, the defendant's behavior itself demonstrated consciousness of guilt. For instance, he parked his car two blocks away from the hospital and walked to the emergency room, although he was bleeding profusely from the leg. Moreover, his responses to police questioning at the hospital con-

cerning his injury were evasive and false. He denied owning a car and having just been involved in an accident, and claimed that he had walked to the hospital after being mugged nearby, but could not give many details about the mugging.

*People v. Pinkney,* 135 A.D.2d at 749–50, 522 N.Y.S.2d at 654–55.

When added to this record is evidence that the murder weapon was found in petitioner's automobile, which he used to make his escape and which he drove to Jamaica Hospital to seek treatment within thirty minutes of the robbery, it is plain that any restriction on the ability of petitioner's attorney to comment on the suggestive nature of the pre-trial identifications at Jamaica Hospital and any error in allowing testimony about petitioner's post-arrest silence could not have affected the verdict and was harmless beyond a reasonable doubt.

While petitioner challenges the admissibility of the eyewitness identifications upon which the Appellate Division relied, the evidence of his guilt is so overwhelming that any error involved in admitting that evidence is harmless as well.[8] In so concluding, I recognize that there is some uncertainty over the application of the harmless error rule. The Supreme Court's early decisions "looked not to whether the jury would have convicted without regard to the error, ... but to whether the error had influenced the jury in reaching its verdict." 3 LaFave and Israel, *Criminal Procedure* § 26.6, at 279 (1984); *Chapman v. Califor-*

*nia,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). Subsequent cases appear to support an application of the harmless error rule that focuses on the issue of whether the untainted evidence is so overwhelming that a jury would have convicted without the tainted evidence. 3 LaFave and Israel, *supra,* at 280–81; *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). *See also Delaware v. Van Arsdale,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986).

While the difference in these two formulations may not be of practical significance in most cases, the latter approach seems particularly appropriate where, as here, the only purpose of the rule requiring the exclusion of erroneously admitted evidence is "truth-furthering." Stacy and Dayton, *Rethinking Harmless Constitutional Error,* 88 Colum.L.Rev. 79, 92 (1988). Evidence of the kind at issue is excluded if it was obtained in a manner that would create a very substantial likelihood of mistaken identification.[9] Chief Judge Oakes put it well in *Kampshoff v. Smith,* 698 F.2d 581 (2d Cir.1983):

There can be no reasonable doubt that inaccurate eyewitness testimony may be one of the most prejudicial features of a criminal trial. Juries, naturally desirous to punish a vicious crime, may well be

---

**8.** The Appellate Division held "that, under the totality of the circumstances, the procedures employed were not so unnecessarily suggestive as to be conducive to an irreparably mistaken identification." *People v. Pinkney,* 135 A.D.2d at 748, 522 N.Y.S.2d at 654. While the issue is a close one, the identifications that took place at Jamaica Hospital are of a kind similar to the "prompt-on-the-scene confrontation" that "does not offend the principles established in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)." *United States ex rel. Cummings v. Zelker,* 455 F.2d 714, 716 (2d Cir.), *cert. denied,* 406 U.S. 927, 92 S.Ct. 1800, 32 L.Ed.2d 128 (1972); *See* Saltzberg, *American Criminal Procedure* 595 (1988).

**9.** The purpose of this rule is different from the rule excluding coerced confessions. Such con-

fessions are excluded even where reliability is not an issue because the methods used to obtain them are offensive. *Spano v. New York,* 360 U.S. 315, 320–21, 79 S.Ct. 1202, 1205–06, 3 L.Ed.2d 1265 (1959); *see Miller v. Fenton,* 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985) ("[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment."). Accordingly, there is a basis for applying the harmless error rule in a different way where a coerced confession has been erroneously admitted into evidence. *See Spano v. New York,* 360 U.S. at 324, 79 S.Ct. at 1207; *see also* Stacy and Dayton, *supra,* at 95–98, 101–104.

unschooled in the effects that the subtle compound of suggestion, anxiety, and forgetfulness in the face of the need to recall often has on witnesses. Accordingly, doubts over the strength of the evidence of a defendant's guilt may be resolved on the basis of the eyewitness' seeming certainty when he points to the defendant and exclaims with conviction that veils all doubt, "[T]hat's the man!" *Id.* at 585 (footnote and citation omitted).

■ As Professors Stacy and Dayton have recently observed in discussing the application of the harmless error rule to the erroneous admission of evidence in violation of rights "whose only purpose is truth-furthering:"

> These rights operate to protect innocent persons from wrongful conviction; they relate to the premise that "it is far worse to convict an innocent man than to let a guilty man go free," and foster confidence that criminal convictions will fall only on those who are actually guilty. The purpose of a truth-furthering right is not frustrated in a particular case if, despite the error, the record as a whole conclusively demonstrates the defendant's guilt or at least demonstrates that the violation could have had no effect on the jury's decision to convict. Truth-furthering rights would thus seem to be ideally suited for *Chapman's* harmless error rule, which ensures reversal of the conviction when reliability may have been impaired, but requires affirmance when the court is substantially certain that the constitutional error did not undermine reliability.

Stacy and Dayton, *supra,* at 92 (footnotes omitted). Where the untainted evidence overwhelmingly establishes guilt and confirms the reliability of the eyewitness identification, and where it is plain that a jury would have convicted even absent the eyewitness identification, there appears to be no reason of policy to reverse the judgment of conviction. *See Boyd v. Henderson*, 555 F.2d 56, 62 (2d Cir.), *cert. denied*, 434 U.S.

927, 98 S.Ct. 410, 54 L.Ed.2d 286 (1977) (impermissible identification is harmless where defendant would have been convicted without such evidence.) [10]

### Conclusion

The petition for a writ of habeas corpus is denied and petitioner is granted a certificate of probable cause pursuant to 28 U.S.C. § 2253.

SO ORDERED.

---

10. In *United States ex rel. Cummings v. Zelker, supra*, the Court of Appeals cited the evidence corroborating the defendant's guilt, among other factors, in concluding that an improperly obtained post-arrest identification "did not taint the witness' testimony nor infect the trial." 455 F.2d at 717.