**UNITED STATES of America, Plaintiff,**

v.

**Ruben PEREA, Defendant.**

**No. 91 CR 136.**

United States District Court, E.D. New York.

April 6, 1994.

**1102**

Zachary W. Carter, U.S. Atty., Brooklyn, NY, by Ellen Corcella, Asst. U.S. Atty., for plaintiff.

Ivan, Fisher, Debra Cohen, New York City, for defendant.

## MEMORANDUM AND ORDER

EDWARD R. KORMAN, District Judge.

On January 9, 1992, the defendant, Ruben Perea, pled guilty to one count of conspiracy to possess and distribute cocaine and marijuana, in violation of 21 U.S.C. § 841(a)(1). The plea was conditioned on the defendant's right to appeal the denial of his motion to suppress evidence found in a duffel bag that had been placed by his accomplice in the trunk of a livery cab in which the defendant was a passenger. The motion was denied on the ground that the defendant did not have an expectation of privacy in the trunk of the taxi because the taxi did not belong to him and because the trunk of the vehicle was simply a storage place for the duration of the taxi ride. The defendant also lacked standing to challenge the search of the duffel bag because he was concededly not the owner of the bag, and was, at most, its temporary custodian:

> At best, the record suggests that Mr. Perea was simply hired to transport the bag from one location to another. Because he does not assert any facts remotely suggesting that he had any expectation of privacy in the contents of the bag, the search did not violate any expectation of privacy that the defendant had in the duffel bag or its contents.

Memorandum and Order dated June 24, 1991 at 3. Because of the conclusion that the defendant did not have a reasonable expectation of privacy in the contents of the duffel bag, it was unnecessary to address extensively the issue whether the defendant had abandoned the bag by denying ownership of it after being asked for his consent to its search. Nor was it necessary to reach the issue whether there was probable cause to search the bag.

On appeal, the Court of Appeals held, *inter alia*, that the defendant, as bailee of the duffel bag, had standing to challenge the admission of the physical evidence seized on February 1, 1991 because he had a subjective expectation of privacy in the duffel bag. *See United States v. Perea*, 986 F.2d 633, 639–42 (2d Cir.1993). This subjective expectation of privacy was evidenced by the surveillance-conscious behavior exhibited by the defen-

dant's accomplice, Hernan Ortiz, who took the duffel bag from a residence˙ at 136–20 61st Road in Queens and loaded it into the trunk of the waiting livery cab, and by similar conduct by the defendant, Perea, when he left the residence at 61st Road and got into the passenger compartment of the cab. Specifically, the Court of Appeals relied on the testimony of the surveilling agents that, when Ortiz returned to the˙ livery cab with a large duffel bag that appeared to be full and heavy, "[h]e looked up and down the street, then signaled the cab driver to open the trunk." 986 F.2d at 636. After placing the bag in the trunk, Ortiz returned to the 61st Road residence. The defendant, Perea, then emerged from the residence and "appeared to check for surveillance, and then got into the cab." *Id.* According˙ to the Court of Appeals:

> Given their descriptions of Ortiz's and Perea's repeated glancing about for surveillance, there can be no doubt that Perea and Ortiz had exhibited subjective expectations of privacy and were attempting to preserve that privacy.

*Id.* at 642.

Moreover, relying on the right of a bailee "to exclude others from possession of the property entrusted to him," *id.* at 640, the Court of Appeals held that the subjective expectation of privacy manifested by Perea was reasonable. Accordingly, it remanded the case with instructions to resolve the ambiguity it perceived with respect to the issue whether the defendant abandoned the bag when he disclaimed ownership of it after being asked for his consent to its search:

> [I]f the court does not find that Perea abandoned the bag or consented to its search, it should conclude that he retained a protectable privacy interest in the bag. If he retained that privacy interest, the court should grant the motion to suppress the contents of the bag unless it concludes that the search was permissible by reason

of an exception to the Fourth Amendment's warrant requirement.

*United States v. Perea,* 986 F.2d at 645.

▮ I conclude that the defendant did not abandon the suitcase—a conclusion the Court of Appeals determined would not be erroneous on this record. *Id.* at 642. Perea's statement that the duffel bag did not belong to him was a truthful statement of fact that cannot alone provide˙ a basis for inferring an intent on his part to abandon the bag. While he may have also intended to disassociate himself from the incriminating contents of the bag, Professor LaFave has cautioned that "a mere disclaimer of ownership in an effort to avoid making an incriminating statement in response to police questioning should not alone be deemed to constitute abandonment." *See* 4 Wayne R. La-Fave, *Search and Seizure,* § 11.3(f), at 343 (1987).[1] Professor LaFave continues:

> The question is whether the owner has 'voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.' Thus, if a person lawfully arrested disclaims any interest in the container and declines to take it with him, his readiness to depart the scene and leave an object such as a suitcase or briefcase in the control of no one may fairly be characterized as abandonment.

*Id.* at 344 (footnotes omitted) (quoting *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir.1973)).

The defendant's disclaimer of ownership here, which is consistent with his testimony at the suppression hearing .regarding his ownership of the bag, does not support an inference that he " 'voluntarily discarded, left˙ behind, or otherwise relinquished his interest in the property in question. . . .' ", *id.,* or that he intended to do so.[2]

---

1. Professor LaFave distinguishes such a disclaimer "from a disclaimer made later in connection with the motion to suppress, which of course can be a basis for finding no standing. *See United States v. Modica,* 663 F.2d 1173 (2d Cir.1981) (no standing where defendant 'insisted

throughout the trial and the appeal that the suitcase is not his.') . . . ." *Id.* at 343, n. 284.

2. Nor did the defendant consent to a search of the bag. The United States Attorney did not rely on consent as justification for the search. Indeed, on the record here, even if consent was

■ The remaining issue is whether there was probable cause to search the duffel bag found in the trunk of the livery cab. If so, the search was valid even though it was undertaken without a warrant. *See California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). The concept of probable cause is practical and non-technical, *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949), and it "exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed" or that evidence of a crime will be found in the place to be searched. *Id.* at 175–76, 69 S.Ct. at 1311 (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)).

■ The Supreme Court has explained repeatedly that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). "In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar,* 338 U.S. at 175, 69 S.Ct. at 1310–11. Thus, the probable cause inquiry focuses on whether under the "totality of the circumstances" there is "sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested" or that evidence of a crime will be found in the place to be searched. *United States v. Patrick,* 899 F.2d 169, 171 (2d Cir.1990).

■ Probable cause requires neither a prima facie showing of criminal activity nor a showing that evidence of crime will more likely than not be found. *United States v. Cruz,* 834 F.2d 47, 50 (2d Cir.1987), *cert. given, it would be difficult to find that it was*

*denied,* 484 U.S. 1077, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1988); *Pinkney v. Keane,* 737 F.Supp. 187, 192 (E.D.N.Y.1990), *aff'd,* 920 F.2d 1090 (2d Cir.1990), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2824, 115 L.Ed.2d 995 (1991). Rather, it requires only the possibility of criminal activity or the possibility that evidence of a crime will be found. *See Pinkney v. Keane,* 737 F.Supp. at 192 (quoting *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)) (probable cause " 'does not demand any showing that such a belief [that evidence of a crime will be found in the place to be searched] be correct or more likely true than false.' "). In making the determination whether probable cause existed at the time of the stop, the experience and expertise of the law enforcement agents should be taken into account. *See* 1 Wayne R. LaFave *Search and Seizure* § 3.2(c), at 570–75 (1987).

Applying these principles to the facts of this case, there was probable cause to believe that the duffel bag contained narcotics or the proceeds of narcotics trafficking. The events which preceded the stop of the livery cab and the search of the duffel bag are set out in detail in the opinion of the Court of Appeals. *United States v. Perea,* 986 F.2d at 635–37. Briefly, surveillance in the vicinity of 97–37 Corona Avenue, Queens ("Corona location") over the preceding two months had developed information that the residence was being used as a centralized location where drug proceeds are counted and to and from which drugs are brought.

The surveillance of the Corona location ultimately suggested a link between it and a house located at 136–20 61st Road in Queens ("61st Road location"). Surveillance was commenced at that location as well. On February 1, 1991, Special Agent Brian Aryai and others followed a grey Nissan from the 61st Road location to another location in Queens. The driver of the grey Nissan, Hernan Ortiz, was observed making a phone call from a pay phone, but it was not clear whether or not it was a beeper call. Ortiz next parked his car and appeared to go into a building. Sometime after Ortiz entered the building, Special Agent Rose McNamara, who had returned to given voluntarily.

the 61st Road location after participating in the initial surveillance of the grey Nissan, observed Ortiz return to the 61st Road location in a livery cab. She saw him get out of the cab, look up and down the street, hurry towards the door and let himself in with a key. Ortiz exited approximately five to seven minutes later carrying what appeared to be a heavy blue duffel bag. As Ortiz exited, he looked up and down the street and then placed the bag in the trunk of the cab.

Ortiz then returned to the house. He and Perea exited the house two to three minutes later. Perea looked up and down the street in a surveillance-conscious manner and had both hands in his pockets. He opened the door to the cab with his right hand, keeping his left hand in his pocket, which led Agent McNamara to believe there was the possibility that he was carrying a weapon. As the cab drove away, she observed that Perea appeared nervous and kept looking about in the cab and looking behind him.

Agent McNamara followed the black livery cab as it left the premises. She was joined shortly by Aryai and two other units that had responded to her radio transmission that the driver of the grey Nissan had returned to the 61st Road location. They noticed that, as he sat in the livery cab, Perea kept looking back and seemed nervous. Moreover, it also appeared that the cab driver was being pressured to drive evasively.

Two or three minutes after Aryai joined the surveillance, the cab was stopped, the trunk was opened and the duffel bag was searched. Inside the bag, the agents found specially wrapped packages of what appeared to be contraband. Later analysis showed it to be 75 pounds of marijuana and 1100 grams of cocaine. A triple beam scale, commonly used to weigh narcotics, was also found in the bag.

The critical testimony on the issue of probable cause came from Agent McNamara in the reopened suppression hearing after the remand. Specifically, she testified that the reason she returned to the 61st Road location after other agents continued surveillance of Ortiz in the grey Nissan was because, if a subject of a surveillance discovers that he is being followed, "oftentimes they'll abandon their car in the street and take a cab or a bus, usually a cab, because they're usually in a hurry, back to the original location." Transcript of Oct. 25, 1993 Suppression Hearing, at 10 [hereinafter "Tr. at"]. When Agent McNamara saw Ortiz return to the 61st Road location and learned via radio transmission from the agents surveilling him that he had obviously detected the surveillance and abandoned the grey Nissan, she understood that this was precisely what happened here.

When Ortiz emerged from the house carrying the duffel bag and "looking up and down the street," Agent McNamara said to herself "there's either a lot of dope or a lot of money in the bag." Tr. at 11. She explained that she believed it was being removed from the house so that, if after returning to pick up the grey Nissan, Ortiz was later followed to the 61st Road residence, "there wouldn't be any drugs or money in the house." Tr. at 11. Indeed, Ortiz left the 61st Road residence after the livery cab pulled away and was arrested after he arrived at the 61st Road residence driving the grey Nissan. While this arrest took place after the search of the duffel bag and had no effect on the decision to search, the return of Ortiz to the 61st Road residence does corroborate the testimony of Agent McNamara.[3]

■ Moreover, the conclusion Agent McNamara drew when she saw Ortiz exit the 61st Road location was confirmed by the surveillance-conscious conduct exhibited by Ortiz and Perea, by Perea's conduct in the cab and the fact that the cab driver appeared

**3.** Agent McNamara is an experienced law enforcement officer who has been a member of the United States Customs Service for seventeen years and, for eight years of that time, a Special Agent with the money laundering group. For the last four years, except for the three months prior to the October 25, 1993 suppression hearing, she has conducted surveillances every other day that were designed to identify people carrying money or drugs. She also has conducted numerous interviews with witnesses and confidential informants to determine the various ways in which money and narcotics are concealed and the methods through which those involved attempt to detect police surveillance.

to be under pressure to drive evasively.[4] When taken together with the surveillance that linked the 61st Road location with the Corona location, it provided an ample basis for Agent McNamara's conclusion that "there was either a lot of dope or a lot of money in the bag." Tr. at 11.

■ Nor is it of consequence that there was no direct evidence to suggest that the defendant or Ortiz had engaged in narcotics trafficking. *See, e.g., Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983) (citations omitted) ("innocent behavior frequently will provide the basis for a showing of probable cause ... In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts."). As Agent McNamara explained in the following colloquy:

Q. And at that point what information if any did you have that Mr. Hernan Ortiz was involved in any kind of activities that might indicate narcotics trafficking?

A. I didn't, particular to each of the individuals, but the circumstances surrounding them and the activities of that day led me to believe that both of them were involved.

Q. Okay.

A. Why would Mr. Perea, if he were a regular passenger in a car, just sit and take his cab ride to wherever he was going? But he wasn't. He kept turning around and looking. He acted very nervous. He hurried up into the car. I thought that he might have been carrying a weapon.

Tr. at 15. Indeed, findings of probable cause have been sustained on observations similar to those made here, even in the absence of direct evidence of criminal activity.

In *United States v. Tussa,* 816 F.2d 58 (2d Cir.1987), the Second Circuit found that probable cause to arrest defendants existed based on the odd series of meetings in which the various defendants engaged throughout the day of the arrest, as well as the surveillance-conscious and evasive conduct in which the defendants engaged. This surveillance culminated in the delivery of a package to the car in which two of the defendants were waiting. The defendants in *Tussa* argued on appeal that their warrantless arrests were made without probable cause and that the resulting evidence should be suppressed because "at no time was either of them seen committing a crime, or handling the white bag, or heard discussing a drug transaction." *Id.* at 62. The Court of Appeals, however, rejected these arguments and concluded that "trained law enforcement officers certainly could reasonably believe that a drug transaction had taken place, and that [the defendants] took part in it." *Id.*

Similarly, in *United States v. Cruz,* 834 F.2d 47 (2d Cir.1987), *cert. denied,* 484 U.S. 1077, 108 S.Ct. 1056, 98 L.Ed.2d 1018 (1988), the Court of Appeals found that there was probable cause to search a truck that had pulled over to the side of a highway. The court also found the warrantless arrest of the driver proper based on the same facts that provided probable cause for the search. In so doing, the court observed:

The information that the agents had available to them at the time of arrest included the results of the prior surveillance efforts of the DEA agent which suggested that Cesar Cruz was involved with narcotics activity. In addition, the agents had observed the loading of the four heavy boxes

---

4. The fact that Special Agent McNamara decided she was going to stop the livery cab, even before she saw the defendant engaged in the surveillance-conscious behavior she observed, does not affect the validity of the stop. The validity of the stop depends on the quantum of evidence available at the time it was made, rather than the evidence available when the law enforcement officer decided she was going to make the stop. *See Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985) (quoting *Scott v. United States,* 436 U.S. 128, 136, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978)) ("Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time' and not on the officer's actual state of mind at the time the challenged action was taken."); *Pinkney v. Keane,* 737 F.Supp. 187, 192 (E.D.N.Y.1990), *aff'd,* 920 F.2d 1090 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2824, 115 L.Ed.2d 995 (1991); 1 Wayne R. LaFave and Jerold H. Israel, *Criminal Procedure* § 3.3, at 188 (1984).

into the trailer portion of the tractor trailer truck from Florida; the extensive construction activity performed on the trailer that led the agents to believe that a hiding place for the boxes was being prepared; the suspects' preoccupation with ensuring that the lights of the truck were functioning properly, thus lessening the chances of being stopped by the police; Cruz's suspicious behavior in stopping his truck one mile after he had entered the New Jersey Turnpike, then turning off the truck's lights and standing by the cab of his truck for several minutes while he intently watched oncoming traffic; and Cruz's evasive driving when the police attempted to stop his truck.

*Id.* at 51.

The facts in the present case, even without direct evidence linking Ortiz or Perea to drug trafficking, provided a reasonable basis for the conclusion that the duffel bag probably contained either narcotics or the proceeds of drug trafficking. Under these circumstances, the search of the duffel bag without a warrant was lawful.

■ Moreover, because the same probable cause to believe drugs or the proceeds of drug trafficking would be found in the car also provided probable cause to believe that the defendant was acting as a knowing courier, his arrest was also valid. Accordingly, there is no basis for suppressing the statements he made after he was seized.

### Conclusion

The defendant's motion to suppress is denied. The judgment of conviction entered on March 30, 1992 is reinstated.

SO ORDERED.